UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

United States of America,

          Plaintiff,

v.

James Robert Carlson (1),
Lava Marie Haugen (2),
Joseph James Gellerman (3),

          Defendants.

Crim. No. 12-305 (DSD/LIB)

**REPORT AND RECOMMENDATION**

---

      This matter came before the undersigned United States Magistrate Judge upon Defendants' motions to suppress evidence, motions to suppress statements, and motions to dismiss the Superseding Indictment.[1]  The case has been referred to the Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  The Court held a hearing on June 20, 2013, on all of the pretrial motions filed by all parties.[2]

      Defendants have each filed motions to dismiss the various counts of the Superseding Indictment against them for various reasons.  Defendants' motions to dismiss contained substantially similar and interrelated arguments, and to the extent that some of the arguments differed, at the hearing on the motions, each of the Defendants adopted many of the arguments and reasoning of those additional arguments advanced by Co-Defendants.  Accordingly, while the Court has attempted to indicate in this Report and Recommendation where a Defendant

---

[1] The original Indictment against Defendants Carlson, Haugen, and Gellerman, filed on December 10, 2012, also indicted Defendant Jamie Paul Anderson.  (See Docket No. 1).  On April 26, 2013, Defendant Anderson entered a plea of guilty as to Count 1 of the Indictment, pursuant to a plea agreement he entered into with the Government. (See Docket Nos. 99-101).  Subsequently, on May 13, 2013, the Government filed a Superseding Indictment against only Defendants Carlson, Haugen, and Gellerman.  (See Docket No. 142).
[2] The discovery motions were the subject of a separate order.  (See Docket No. 211).

joined in the arguments of another Defendant, any omission of such reference is not to be construed as material. To the extent that any argument to dismiss was advanced by more than one Defendant, whether independently or by way of written or verbal joinder, the Court's recommendation as to the disposition of such argument apples to all Defendants joining therein, whether or not each Defendant is mentioned by name, or the reference in this Report and Recommendation is only to the Defendant principally advancing an argument, or is stated in the masculine or feminine, or in the singular or plural.

Having considered all of the parties' written submissions,[3] arguments made at the hearing, and the evidence in the record, the Court now recommends that all of Defendants' motions be **DENIED**.

## I. MOTIONS TO DISMISS THE SUPERSEDING INDICTMENT

The Eighth Circuit has set the following standard for the sufficiency of a criminal indictment:

> An indictment adequately states an offense if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution. An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted."

United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) (quoting United States v. Hernandez, 299 F.3d 984, 992 (8th Cir. 2002)). Because there is "no equivalent in criminal procedure to the motion for summary judgment that may be made in a civil case . . . the government has no duty to reveal all of its proof before trial." United States v. Nabors, 45 F.3d 238, 240 (8th Cir. 1995).

---

[3] Two days prior to the hearing Defendant Haugen and one day prior to the hearing Defendant Carlson filed motions for leave to file a reply. (See Docket Nos. 205-208). At the hearing, the Court granted Defendants' motions for leave to file a reply, and the Court has reviewed and considered the filings in making its recommendations.

**A. Motions to Dismiss Counts 1-17 of the Superseding Indictment[4] [Docket Nos. 103, 122, 124, 183]**

Counts 1-17 of the Superseding Indictment allege violations of several sections of the Federal Food, Drug, and Cosmetic Act (FDCA). Count 1 alleges that Defendants Carlson, Haugen, and Gellerman engaged in a conspiracy to: 1) cause the introduction of misbranded drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2); 2) receive and cause the receipt of misbranded drugs in interstate commerce and to deliver and proffer delivery thereof for pay or otherwise, in violation of 21 U.S.C. §§ 331(c) and 333(a)(2); and 3) do and cause to be done acts with respect to drugs, while such drugs were held for sale after being shipped in interstate commerce, that resulted in such drugs being misbranded, in violation of 21 U.S.C. §§ 331(k) and 333(a)(2). (Superseding Indictment [Docket No. 142] ¶¶ 5-6). Counts 2-10 allege that Defendant Carlson caused the introduction of several misbranded drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a), 333(a)(2), 352(a), 352(b), and 352(f). (Id. ¶¶ 25-27). Counts 11-16 allege that Defendant Carlson received and caused the receipt in interstate commerce of misbranded drugs and caused the delivery, delivered and proffered delivery of such misbranded drugs to a customer or customers for pay, in violation of 21 U.S.C. §§ 331(c), 333(a)(2), 352(a), 352(b), and 352(f); Counts 13 and 14 allege the same charges but against Defendant Gellerman, and Count 15 alleges the same charges against Defendant Haugen. (Id. ¶¶ 28-30). Count 17 alleges that Defendants Carlson and Haugen caused to be done acts with respect to a drug that result in the drug being misbranded, while the drug was held for sale

---

[4] The Court notes that some of the motions filed by Defendants challenging Counts 1-17 were filed prior to the filing of the Superseding Indictment. (See Docket Nos. 103, 122, and 124). In fact, only one motion was filed to dismiss any of these counts in the Superseding Indictment, though this motion had no accompanying written memorandum in support of it. (See Docket No. 183). Because Counts 1-17 of the original Indictment are essentially the same as Counts 1-17 of the Superseding Indictment, the Court construes all of the motions to dismiss these counts as motions to dismiss the counts in the Superseding Indictment.

after being shipped in interstate commerce, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 331(k), 333(a)(2), 352(a), 352(b), and 352(f).  (Id. ¶¶ 31-33).

Defendant Haugen and Defendant Carlson submitted virtually the same memorandum in support of their respective motions to dismiss all of the FDCA counts against them (Docket Nos. 104 and 123, respectively), with the exception that the arguments advanced by Defendant Carlson regarding fraud and arbitrary prosecution (Docket No. 123 at 10-15, 22-28) were not made in Defendant Haugen's memorandum.  While Defendant Gellerman failed to file any memorandum in support of his motion to dismiss Counts 1, 13 and 14, at the hearing on the motions, he adopted the written memorandum filed by Defendant Carlson [Docket No. 123] as well as Defendants Carlson and Haugen's reply memorandums [Docket Nos. 206-208].  Therefore, the Court collectively considers all of the offered arguments for dismissing the FDCA counts against Defendants.

**1. Defendants' prosecution is not based on a novel interpretation of the FDCA statute**

Defendants argue that numerous vendors have been selling the alleged substances prior to the date of the Indictment (dating all the way back to 2004) and that the FDA has not issued any "Warning Letters" to advise individuals that the mislabeling or distribution of the alleged substances is illegal.  (See Mem. of Points and Authorities [Docket No. 123] at 1-6).  They rely on United States v. Lanier, 520 U.S. 259, 266 (1997), in which the United States Supreme Court stated that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  In Lanier, the Court held that an individual could not be prosecuted under 18 U.S.C. § 242 for willfully, under color of law, depriving a person of rights protected by the Constitution unless "in the light of pre-existing law the unlawfulness under the Constitution is apparent."  Id.

at 271-72. The Court explained that "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267. For the reasons explained below, the Court finds that both the statute and numerous prior judicial decisions should have informed Defendants that their alleged conduct was prohibited.

Contrary to Defendants' argument for why this is a "novel prosecution," there is simply no legal requirement that the Food and Drug Administration (FDA) issue a "Warning Letter" before an individual may be prosecuted for a violation of the FDCA. Although Defendants argue that no warning letters have been issued regarding AM-2201, UR-144, XLR11, or any similar substance since 2004 when these products became popular, (see Mem. of Points and Authorities at 4-5), they have presented no authority whatsoever requiring such a "Warning Letter" before they may be prosecuted.

Even the FDA Procedures Manual explains that "[w]hen it is consistent with the public protection responsibilities of the agency and depending on the nature of the violation, it is the United States Food and Drug Administration's (FDA's) **practice** to give individuals and firms an opportunity to take voluntary and prompt corrective action before it initiates an enforcement action."[5] Such warning letters "are issued to achieve voluntary compliance and to establish prior notice." Id. However, the FDA makes clear that "responsible individuals should not assume that they would receive a Warning Letter, or other prior notice, before FDA initiates enforcement action." Id. "FDA is under no legal obligation to warn individuals or firms that they or their products are in violation of the law before taking enforcement action, except in a few specifically defined areas." Id. "[A]s previously stated, a Warning Letter is not a prerequisite to taking

---

[5] FDA, Warning Letter Procedures,
http://www.fda.gov/ICECI/ComplianceManuals/RegulatoryProceduresManual/ucm176870.htm#SUB4-1-1 (last visited July 23, 2013) (emphasis added).

enforcement action." Id. And as explained by several courts, "a warning letter from the FDA is 'informal and advisory.'" In re Genzyme Corp., 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012); Anderson v. Abbott Labs., 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001) ("There is nothing magical about [an FDA] warning letter. Although the language sounds ominous, it really is rather boilerplate."); Holistic Candlers and Consumers Ass'n v. Food & Drug Admin., 664 F.3d 940, 944 (D.C. Cir. 2012). And just as a warning letter does "not commit the FDA to taking enforcement action," the absence of the letter does not prevent it from doing so. See Id. Under the broad definition of what substances can fall within the definition of a "drug," as defined in the FDCA, Defendants' argument would require that, prior to prosecution, the FDA issue a warning or notice for every type of substance—in other words giving a fair opportunity for a defendant to stop his unlawful conduct. Defendants have presented no authority for such a "safe harbor" provision under the FDCA, nor is the Court aware of any general legal principle requiring that a defendant be advised that his or her conduct has crossed the threshold into the criminal. Simply put, Defendants have provided no authority holding that an FDA warning letter is a prerequisite to an enforcement action.

Defendants' also argue that "21 U.S.C. § 321(p) clearly shows that the label is controlling" and because the substances were labeled "Not for Human Consumption," Defendants cannot be held responsible for the misuse by their customers. (See Mem. of Points and Authorities at 2-3). They assert that Defendants "assumed and had the right to assume that as long as they labeled their products 'not for human consumption,' the products were legal to sell." (Id. at 3).

Contrary to Defendants' argument, 21 U.S.C. § 321(p) does not provide a complete defense to misbranding charges based on the label placed on a substance. Rather, 21 U.S.C. §

321(p) merely provides the definition of the term "new drug" and in no way pertains to the sections of the FDCA with which Defendants have been charged here. The statute Defendants are charged with violating provides that it is illegal to "introduc[e] or deliver[] for introduction into interstate commerce [] any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331. In considering what constitutes a drug, this Court has explained numerous times that "it is the intended use of an article which determines whether or not it is a 'drug,' and that even the most commonly ingested foods and liquids are 'drugs' within the meaning of the Act if the intended use of such articles when distributed in interstate commerce falls within the definition of § 321(g)(1)." Hanson v. United States, 417 F. Supp. 30, 34 (D. Minn. Feb. 20, 1976); United States v. Pro-Ag, Inc., 796 F. Supp. 1219, 1224 (D. Minn. 1991) (Doty, J.), aff'd, 968 F.2d 681 (8th Cir. 1992) ("As the FDCA definition of 'drug' quoted above indicates, whether a product is a drug depends on its intended application. A number of federal courts have held that the intended application of a product may be determined from any relevant source, including product labels, labeling, and advertising."); see also United States v. Livdahl, 459 F. Supp. 2d 1255, 1260 (S.D. Fla. 2005) ("Promotional materials for a product which are shipped separately from the product, graphic materials distributed to prospective purchasers of the product and oral representations made to users and prospective users are equally relevant to show the intended use of the product because the FDCA is 'given a liberal interpretation to effectuate its high purpose of protecting unwary consumers in vital matters of health.'" (quoting United States v. Hohensee, 243 F.2d 367, 370 (3d Cir. 1957)); United States v. Kasz Enters., Inc., 855 F. Supp. 534, 539 (D. R.I. 1994) ("The intended use of a product is determined by the vendor's objective intent in promoting, distributing, and selling the product."). Defendants do not appear to dispute that the alleged substances fall within the meaning of

"drug," as defined in 21 U.S.C. § 321(g)(1), or that the substances may be regulated under the FDCA; however, to the extent that Defendants argue that the substances are not drugs as a matter of law within the meaning of the FDCA because their labels indicate they are not drugs, such an argument is wholly without merit.  See United States v. Sullivan, 714 F.3d 1104, 1107 (8th Cir. 2013) ("A label indicating a substance is not for human consumption is not dispositive evidence of the distributor's intent."); United States v. Undetermined Quantities of an Article of Drug Labeled as Exachol, 716 F. Supp. 787, 791 (S.D. N.Y. 1989) (holding that "[a]n article intended to be used as a drug will be regulated as a drug . . . even if the product['] labeling states that it is not a drug"); United States v. Travia, 180 F. Supp.2d 115, 116-19 (D. D.C. 2001) (finding that nitrous oxide in balloons, sold at a rock concert, was a drug and explaining that the intended use was what classified the nitrous oxide as a drug, which may be derived from various sources such as labels, advertising, or even customer intent).[6]

Thus, distilled to its core, the argument advanced by Defendants appears to be that when a product is labeled "not for human consumption," as a matter of law, it cannot be misbranded, and any other reading of the statute is "novel" and in violation of Defendants' due process rights. Unsurprisingly, Defendants do not offer a single case standing for this proposition.  Rather, Defendant Carlson provides that he could not "find one reported criminal case or court decision where labeling a substance 'not for human consumption' was alleged to be false or misleading labeling or misbranding."  (See Mem. of Points and Authorities [Docket No. 123] at 4). However, numerous courts have upheld convictions and determined that a defendant may be

---

[6] These cases not only demonstrate the wide scope of what may be considered a drug under the FDCA but also demonstrate that the charges against Defendants for misbranding are in no way novel.  See also United States v. Poor, 230 F.3d 1365, 2000 WL 1341540, at *1 (8th Cir. Sep. 19, 2000) (table decision) (upholding the defendant's guilty plea to manufacture and distribution of misbranded and adulterated drug charges and explaining that "a jury could find GHB is a drug within the meaning of the Act based on [the defendant's] intended use of the substance"); United States v. Article . . . Consisting of 216 Cartoned Bottles, More or Less, Sudden Change, 409 F.2d 734, 739 (2d Cir. 1969) (citing numerous cases and explaining that "ordinary food products, such as peppermint tea leaves," cigarettes, honey, mineral water, and an animal heart all could fall within the FDCA definition of drug).

prosecuted where a defendant was charged for distributing misbranded drugs, even though the drugs were labeled as "Not for Human Consumption."  See United States v. Johnson, 471 F.3d 764, 765 (7th Cir. 2006) (upholding a defendant's conviction under 21 U.S.C. § 331(a)—the same statute as in this Indictment—where the defendant had sold and introduced into interstate commerce a drug that was labeled "not for human consumption"); Livdahl, 459 F. Supp. 2d at 1258 (labels stating that the product was "For Research Purposes Only[;] Not for Human Use"); see also United States v. Storage Spaces Designated Nos. 8 and 49, 777 F.2d 1363, 1367 (9th Cir. 1985) (holding that "[a] drug is also misbranded if 'its labeling is false or misleading in any particular[,]' 21 U.S.C. § 352(a)" and explaining that "[b]ecause the products [were] labeled as 'incense,' when it appear[ed] that they [were], in fact, intended for drug use, there [was] a reasonable basis for believing that the labeling [was] false and misleading"); United States v. Schraud, 2007 WL 4289660, at *4 (E.D. Mo. Dec. 4, 2007) (explaining that labeling a drug "for research" does not make it so because "[t]o hold otherwise would establish a simple method and disclaimer for avoiding FDA detection and regulation").  In summary, there is nothing "novel" about prosecuting someone for mislabeling a drug labeled as "not for human consumption," when in fact consumption was precisely the drug's alleged intended use, further alleged to be known and intended by the Defendant.

Therefore, the Court finds that the Government has not engaged in any novel interpretation of the FDCA provisions at issue that would be barred by Lanier.

## 2. Defendants' argument that by complying with the labeling provision for the substances at issue, they would be violating the "new drug" statutes[7]

Defendants argue that placing labels as described in the Indictment (wherein it specifies the alleged labeling deficiencies at issue here) "would clearly constitute serious crimes because a New Drug Application has not been filed for AM-2201, UR-144, XLR11." (See Mem. of Points and Authorities at 8-10). Again, Defendants offer no authority whatsoever for this assertion and this argument is wholly without merit to the issue of whether Defendants may be prosecuted under the mislabeling provisions alleged in the Superseding Indictment. Whether different labeling of the substances at issue would allow their approval as "new drugs" or whether it might subject an individual to liability for a violation of the "new drug" statutes is entirely irrelevant. The question now before the Court is whether Defendants violated §§ 331 and 333 on the actions alleged in the Superseding Indictment—not whether truthful disclosure of a substance's purpose, as alleged by the Government, could subject Defendants to other violations of law. In other words, the fact that putting a label on a substance to comport with the alleged actual use of the substance might subject an individual to other charges in no way relieves an individual of the liability, under §§ 331 and 333, for mislabeling substances. Merely because revealing the true nature and effects of a product will reveal that the products are in violation of prohibited or sanctioned conduct does not immunize a defendant from a statute requiring truthful labeling. If Congress has seen fit to criminalize not only the sale of an illegal substance but also the mislabeling of a substance in order to encourage truthful labeling, one does not provide

---

[7] Defendants also argue that "[i]f AM-2201, UR-144, XLR11 are to be considered 'drugs' under the general FDA definition of 'drug' . . . then [sic] substances are also subject to the definition of 'new drug' found in FDA Statues, because they have never been submitted to the FDA through a New Drug Application." (See Mem. of Points and Authorities [Docket No. 123] at 6). Whether the substances may also be considered "new drugs" is wholly irrelevant to the issues before the Court. The Government has not charged Defendants with any violations of the "new drug" sections of the FDCA. The Indictment only alleges violations of the law as to the substances at issue in their alleged representation as "drugs." Defendants' arguments that "the subjective intent of the vendor is irrelevant" under the definition of a "new drug" is itself completely misplaced as to the present posture of this case as charged. (Id. at 7).

immunity for the other—a defendant cannot seek immunity because accurate labeling reveals the illegal nature of a substance. As such, contrary to Defendants' argument, "Defendants are [not] being prosecuted for failing to commit crimes." (Id. at 10). Defendants are charged for taking actions that the Government alleges are in violation of §§ 331 and 333.

### 3. Defendant Carlson's argument that his conduct does not meet the definition of fraud

Defendant Carlson argues that the Government cannot show all 11 elements of fraud under Minnesota civil law. (See Mem. of Points and Authorities at 10-15). Interpreting the argument liberally, it appears to be an attack on the allegation that Defendants conspired "with the intent to defraud and mislead." (See Superseding Indictment ¶ 6). Defendant Carlson argues that even if the Government could show the first three elements of fraud (a false representation having to do with a past or present fact), it cannot show that the representation was material, that anyone relied on the representation, or that there were damages as a result of the representation, as required under Minnesota law for a common law fraud claim. (See Mem. of Points and Authorities at 12-13). Of course, this action is not based on a civil claim for common law fraud, nor does the Court apply Minnesota law in a federal prosecution. As such, it is entirely puzzling to the Court why Defendant Carlson believes that the Government is mandated to prove all elements of common law fraud under Minnesota law to demonstrate that Defendants in this case acted with the intent to defraud. See, in contrast, United States v. Hiland, 909 F.2d 1114, 1129 (8th Cir. 1990) (finding no error in the district court's instruction, involving misbranding charges under §§ 331 and 333, "that to act with the intent to defraud 'means to act with the specific intent to deceive or cheat.'"); see also United States v. Haas, 171 F.3d 259, 267 (5th Cir. 1999); United States v. Cambra, 933 F.2d 752, 755 (9th Cir. 1991), superseded by statute on other grounds as stated in United States v. McEnry, 659 F.3d 893 (9th Cir. 2011). Importantly, the Court need not

at this time, and does not, establish what evidence the Government must prove to demonstrate intent to defraud or how the Court might instruct the jury at trial on that element. But Defendant Carlson has not offered any authority that the Court should apply the common law definition of fraud under Minnesota law, much less that the Government's failure to demonstrate each and every one of those elements of common law fraud requires dismissal of the charges of fraud in this federal Superseding Indictment.

If the Government can ultimately show intent to defraud, then it may subject Defendants to harsher punishment. Compare 21 U.S.C. § 333(a)(1) with 21 U.S.C. § 333(a)(2); see also United States v. Acosta, 17 F.3d 538, 541 (2d Cir. 1994) ("§ 333(a) provides two levels of penalties for persons convicted of adulterating or misbranding drugs in violation of § 331"). And whether the Defendants acted with intent to defraud is a question of fact for the jury, not for this Court in the context of the present motion. See United States v. Brown, 763 F.2d 984, 989 (8th Cir. 1985) (explaining that the "**jury** may properly infer [intent to defraud] from circumstantial evidence" (emphasis added)); Acosta, 17 F.3d at 541-42 ("[T]he trial court instructed the **jury** to focus on the question of intent to defraud or mislead." (emphasis added)).

Therefore, Defendant Carlson has failed to demonstrate why the Government's alleged failure to demonstrate all of the elements of a common law fraud claim, under Minnesota civil law, requires dismissal of the charge in the Superseding Indictment at this time.

### 4. Defendants' argument that the statute is void for vagueness

Under the Fifth Amendment's guarantee that every citizen is entitled to due process, "vague statutes are void." United States v. Washam, 312 F.3d 926, 929 (8th Cir. 2002). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first

essential of due process of law." Connally v. General Construc. Co., 269 U.S. 385, 391 (1926). The law must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Therefore, "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975).

"In determining whether a statute is unconstitutionally vague on the facts at hand," the Court applies a two-part test: 1) "the statute must provide adequate notice of the proscribed conduct"; and 2) "the statute must not lend itself to arbitrary enforcement." Washam, 312 F.3d at 929.

Defendants frame their argument as one for void for vagueness, but they fail to articulate specifically which part of any of the misbranding statutes they believe is vague, unclear, or requires them to guess at its meaning (i.e., it does not permit a person of common intelligence to understand what is prohibited). (See Mem. of Points and Authorities at 15-28). Instead, much of Defendants' argument is merely a repeat of Defendants' prior argument that they should have been provided with a warning letter or some other kind of notice from the FDA that the sale of the specific substances at issue in the Superseding Indictment could subject them to misbranding charges. (See Mem. of Points and Authorities at 17-22). The fact that such warning letters or notices may "clearly provide the necessary notice required by the Due Process Clause to enable law abiding citizens, such as defendants, to discern a bright line between legal and illegal conduct," (Id. at 19), in no way demonstrates that the absence of such warnings make the statute prohibiting the conduct void for vagueness or that the FDA is legally required to warn individuals prior to prosecution. Whether it would have been a "burden on the FDA" to issue

such a warning or whether it "would have [provided Defendants] the opportunity to conform their conduct," (Id.), are irrelevant questions to the challenge of void for vagueness. The Court has already addressed this argument about warning letters and need not reiterate its lack of merit any further.

Defendants also argue that because several large drug companies receive warning letters from the FDA, despite their large resources, the statutes are impermissibly vague: Even though these large drug companies "have very large FDA Compliance Departments, with in-house lawyers, medical researchers, doctors, and other experts who do nothing but study and work with FDA Statutes and Regulations, day in and day out, year after year," they still "do not understand FDA Statutes and Regulations well enough to avoid labeling/misbranding violations," which shows that "the law is plainly not clear enough to warn ordinary citizens, like Defendants, of whether their conduct is legal or illegal." (Mem. of Points and Authorities at 23).

Clearly, the mere showing of others' potential violations of a statute is not conclusive proof that such a statute is not sufficiently definite. Even the clearest and most articulate of laws might be violated by individuals or corporations for various reasons—their own subjective lack of understanding or willful violation despite a full knowledge of the law. While Defendants appear to argue that no one could read the FDCA provisions and know what conduct is prohibited, unlike the challenger in the United States Supreme Court cases Defendants cite, Defendants have failed to identify any relevant portion of the FDCA provision with which they are charged with violating that they believe is not sufficiently definite. Furthermore, Defendants have not demonstrated that any of the warning letters to which they refer involved allegations of potential wrongdoing for the provisions that are presently at issue before the Court. To the contrary, they acknowledge that none of the warning letters they refer to pertain to the provisions

or issues relevant in this lawsuit. (<u>See</u> Mem. of Points and Authorities at 20) ("[N]ot one 'warning letter' could be found among the thousands of FDA 'warning letters' that incorporates any of the criminal allegations or issues set forth in the present Indictment."). This is important not only because it prevents the Court from meaningfully and specifically analyzing Defendants' general argument that <u>some</u> provision of the FDCA may be void for vagueness but also because it entirely undermines Defendants' apparent argument that the evidence of warning letters to other sophisticated parties demonstrates vagueness in the specific statutes that are now at issue in this Superseding Indictment. Simply put, the fact that the FDA may need to issue warning letters to sophisticated parties regarding potential violations of the many FDCA provisions not at issue in this litigation, even if it could show vagueness as to those provisions, in no way demonstrates that the provisions at issue in this litigation are vague. <u>See</u> <u>Village of Hoffman Estates v. Flipside, Hoffman, Estates, Inc.</u>, 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."); <u>United States v. Yielding</u>, 657 F.3d 688, 715 (8th Cir. 2011); <u>United States v. Najarian</u>, 915 F. Supp. 1460, 1472 (D. Minn. 1996) (refusing to consider hypotheticals about how certain provisions of the FDCA may be unconstitutionally vague).

Overall, it is unclear to the Court whether Defendants' global challenge to the "FDA labeling misbranding Criminal Statutes" or "FDA Statutes and Regulations" (Mem. of Points and Authorities at 16, 24), takes issue with the definition of "drug," <u>see</u> 21 U.S.C. § 321(g)(1), whether Defendants believe the prohibited acts sections are void for vagueness, <u>see</u> 21 U.S.C. § 331, whether Defendants challenge the definition of misbranding, <u>see</u> 21 U.S.C. § 352, or whether their quarrel is with some other provision in the FDCA. It is not the Court's role to analyze and consider every word, phrase, or provision in all of the FDCA statutes upon the

Defendants' suggestion or conclusory argument that some portion of some statute may be so vague as to deem it unconstitutional. It appears, then, that Defendants are asking the Court, as a matter of law, to invalidate all of the FDCA statutes. Defendants themselves acknowledge that the "FDA labeling and branding law is very complex and fact specific," but appear to overlook this issue when making their argument. In considering the definition of "drug" and prospective breadth of the term, as defined in the FDCA, the United States Supreme Court explained that the Court "must give effect to congressional intent in view of the well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health." United States v. Article of Drug . . . Bacto-Unidisk, 394 U.S. 784, 798 (1969). The Court finds that Defendants have failed to demonstrate that a person of "common intelligence must necessarily guess at [the] meaning" of any of the relevant provisions and have not demonstrated that any of the governing statutes fail under the first part of the two-part test.[8] See Travia, 180 F. Supp. at 123 (rejecting the defendant's void for vagueness challenge of the FDCA and holding that "Congress has provided sufficient notice through these provisions; they are not so vague or standardless that the ordinary public is left uncertain as to what is prohibited").

Defendants' also appear to make a veiled argument that **some** of the FDCA misbranding statutes, which they have again not identified, fail the second part of the test because the "warning letters" and "guidance documents" from the FDA "put meat on the bones." (Mem. of Points and Authorities at 22-28). Defendants are correct that a statute may be invalidated for vagueness if it authorizes or encourages "arbitrary and discriminatory enforcement." City of

---

[8] Defendants' citation to two United States Supreme Court cases, both of which are entirely inapposite, without any explanation on why either case is applicable to the issues before the Court in no way bolsters their argument, despite their use of conclusory words such as "exactly," "clear," and "outrageously unfair." (See Mem. of Points and Authorities at 21-22) (citing Christopher v. SmithKline Beecham Corp., --- U.S. ---, 132 S. Ct. 2156, 2168 (2012) and Talk America, Inc. v. Michigan Bell Tel. Co., --- U.S. ---, 131 S. Ct. 2254, 2266 (2011) (Scalia, J. concurring)).

Chicago v. Morales, 527 U.S. 41, 56 (1999); Washam, 312 F.3d at 929. However, Defendants have again failed to identify which "FDA labeling and misbranding Statutes" they believe "allow[] discriminatory law enforcement," (see Mem. of Points and Authorities at 17), nor have they made a sufficient showing that any of the provisions at issue permit arbitrary and discriminatory enforcement. Moreover, all that is required is that "a legislature establish minimal guidelines to govern law enforcement." Kolender v. Lawson, 461 U.S. 352, 358 (1983). A penal statute may be void for vagueness if "the legislature fails to provide such minimal guidelines, [because it] may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" Id. (internal quotation marks omitted). The concern under such an inquiry is that such law would "substitute the judicial for the legislative department of government." Id. n.7. Nevertheless, the fact that the FDA has authority and may choose to send out "warning" or "notice" letters in an effort to encourage violators to comply with the federal law does not demonstrate that the Government arbitrarily dictates which drugs are or are not subject to § 331.[9]

Therefore, for all of the reasons discussed above, the Court finds that Defendants' motions to dismiss Counts 1-17 of the Superseding Indictment should be **DENIED**.

**B. Motions to Dismiss Counts 18-30 of the Superseding Indictment**[10]

Counts 18 and 19 of the Superseding Indictment allege that Defendant Carlson knowingly and intentionally distributed a mixture or substance containing a detectable amount of a controlled substance, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a) and 841(b)(1)(C).

---

[9] To the extent Defendants may also seek to rely on the doctrine of entrapment by estoppel as a basis to dismiss Counts 1-17 of the Superseding Indictment, that argument fails for all the reasons discussed in Part I.B.10, infra.

[10] The Court notes that some of the motions filed by Defendants challenging Counts 18-30 were filed prior to the filing of the Superseding Indictment; however, because Counts 18-29 of the original Indictment are essentially the same as Counts 18-29 of the Superseding Indictment, and because Count 30 in the Superseding Indictment alleges the same type of violation as Counts 22-29 of the Superseding Indictment against Defendant Carlson, the Court construes all of the motions to dismiss these counts as motions to dismiss Counts 18-30 in the Superseding Indictment.

(Superseding Indictment ¶¶ 34-37). Count 20 alleges that Defendant Carlson knowingly and intentionally possessed with the intent to distribute a mixture or substance containing a detectable amount of a controlled substance, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a) and 841(b)(1)(C). Count 21 alleges that Defendants Carlson, Haugen, and Gellerman knowingly and intentionally conspired to distribute and possess with the intent to distribute six different substances, each of which was a controlled substance analogue as defined in 21 U.S.C. § 802(32)(A), knowing that each was intended for human consumption, as provided in 21 U.S.C. § 813, all in violation of 21 U.S.C. §§ 802(32)(A), 813, 841(a), 841(b)(1)(C), and 846. (Superseding Indictment ¶¶ 40-42). Counts 22-30 of the Superseding Indictment allege that Defendant Carlson knowingly and intentionally distributed a mixture or substance containing a detectable amount of various compounds identified specifically in the Superseding Indictment, each of which was a controlled substance analogue, as defined in 21 U.S.C. §802(32)(A), knowing that each was intended for human consumption, as provided in 21 U.S.C. § 813, all in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 802(32)(A), 813, 841(a), and 841(b)(1)(C). (Id. ¶¶ 43-45).

As with Defendants' motion to dismiss the FDCA counts, Defendants have filed numerous motions raising various arguments for why Counts 18-30 should be dismissed. The Court addresses Defendants' arguments by subject matter.

### 1. Background on Defendants' motions to dismiss for alleged statutory violations

Defendants make a variety of arguments for the dismissal of some or all of the counts against them arising from the statutory language of the Congressional Review Act, the Controlled Substances Act, and the Synthetic Drug Abuse Prevention Act, and from the scheduling of certain controlled substances pursuant to those Acts.

### a. The Congressional Review Act Background

The Congressional Review Act, 5 U.S.C. § 801 (CRA), generally requires that, before an agency rule takes effect, the agency must submit to each chamber of Congress and to the Comptroller General a report containing (1) a copy of the rule; (2) a statement of whether the rule is a "major rule,"[11] and (3) the proposed effective date of the rule.  5 U.S.C. § 801(a)(1)(A).  However, the CRA also provides that "[a]ny rule which an agency for good cause finds that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest, shall take effect at such time as the Federal agency promulgating the rule determines."  5 U.S.C. § 808(2).

### b. The Controlled Substances Act Background

The Controlled Substances Act, 21 U.S.C. § 801 et seq. (CSA), "establishes five categories or 'schedules' of controlled substances, the manufacture, possession, and distribution of which the Act regulates or prohibits."  Touby v. United States, 500 U.S. 160, 162 (1991).  Substances placed in Schedule I are "believed to pose the most serious threat to public safety," and, consequently, penalties for the manufacture, possession, and distribution of Schedule I substances are more severe than those for other scheduled substances.  Id.  The CSA provides for the prosecution of persons who "knowingly or intentionally . . . manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," 21 U.S.C. § 841, and of those who conspire to do so.  21 U.S.C. § 846.

Under the CSA, the Attorney General has authority to determine which substances belong in which schedule, if any.  Touby, 500 U.S. at 162 (citing 21 U.S.C. § 811(a)).  Since 1973, the Attorney General has delegated this authority to the Administrator of the DEA.  28

---

[11] A "major rule" generally cannot take effect for at least sixty (60) days.  5 U.S.C. § 801(a)(3).

C.F.R. § 0.100 (2013).[12]  Additionally, the CSA defines the term "controlled substance

analogue," 21 U.S.C. § 802(32)(A), and provides that "[a] controlled substance analogue shall, to

the extent intended for human consumption, be treated, for the purposes of any Federal law as a

controlled substance in schedule I."  21 U.S.C. § 813.

The CSA also provides that the DEA may, by order, temporarily schedule a substance "to

avoid imminent hazards to public safety."  21 U.S.C. § 811(h).  Ordinarily, the DEA must

consider eight (8) factors when making a determination whether to schedule or remove a

substance.  21 U.S.C. § 811(c).[13]  However, when acting under the CSA's temporary scheduling

provisions, the DEA need only consider "those factors set forth in paragraphs (4), (5), and (6)."

21 U.S.C. § 811(h)(3).  The DEA is required to notify the Secretary of Department of Health and

Human Services (HHS), and to publish in the Federal Register notice of its intention to issue a

temporary scheduling order and the grounds for such an order, at least thirty (30) days before

issuing its final order temporarily scheduling a substance.  21 U.S.C. § 811(h)(1).  An order

temporarily scheduling a substance expires two (2) years after it is issued, unless the DEA

extends the order.  21 U.S.C. § 811(h)(2).

### c.  The Synthetic Drug Abuse Prevention Act Background

The Synthetic Drug Abuse Prevention Act (SDAPA) is part of the Food and Drug

Administration Safety and Innovation Act (FDASIA).  Pub. L. No. 112-144, 126 Stat. 993 (July

9, 2012).  Among other things, the SDAPA added certain substances—including JWH-018, AM-

2201, and MDPV—to Schedule I under the CSA.  See Id. at Title XI, subtitle D, § 1152(a)-(b),

---

[12] Defendants assert, in other motions, that this delegation is unconstitutional and, consequently, that they cannot be
prosecuted based on the DEA's unlawful authority.  (See Docket Nos. 131, 158, 177).  Those motions are addressed
in Part I.B.4, infra, of this Report and Recommendation.
[13] Those eight factors are: "(1) Its actual or relative potential for abuse.  (2) Scientific evidence of its
pharmacological effect, if known.  (3) The state of current scientific knowledge regarding the drug or other
substance.  (4) Its history and current pattern of abuse.  (5) The scope, duration, and significance of abuse.  (6) What,
if any, risk there is to the public health.  (7) Its psychic or physiological dependence liability.  (8) Whether the
substance is an immediate precursor of a substance already controlled under this subchapter."  21 U.S.C. § 811(c).

126 Stat. at 1131-21.  Some sections of the FDASIA list specific effective dates for those

sections.  See, e.g., Id. at Title I, § 106, 126 Stat. at 1002 ("The amendments made by *this title*

shall take effect on October 1, 2012, or the date of the enactment of this Act, whichever is later .

. ." (emphasis added)); at Title II, § 206, 126 Stat. at 1007 (same); at Title V, § 506(c)(1), 126

Stat. 1045 (". . . the amendments made by this section shall take effect 180 calendar days after

the date of enactment of this Act . . .").  However, the Title, subtitle, and sections pertaining to

the SDAPA contain no such specific enactment dates.

### d.  Background on the DEA's Final Order Temporarily Placing JWH-018 in Schedule I

On October 6, 2010, the DEA notified the HHS of its intent to temporarily place five

synthetic cannabinoids, including JWH-018, into Schedule I.  See Notice of Intent, 75 Fed. Reg.

71635, 71637 (Nov. 24, 2010) (describing letter from DEA Deputy Administrator to Assistant

Secretary of HHS).  Subsequently, on November 24, 2010, the DEA published in the Federal

Register notice of its intention to temporarily place the synthetic cannabinoids into Schedule I,

stating that such action was necessary to avoid "an imminent hazard to the public."  75 Fed. Reg.

71635.[14]

On March 1, 2011, the DEA published a Final Order temporarily placing the five

synthetic cannabinoids in Schedule I, pursuant to § 811(h).  Final Order, 76 Fed. Reg. 11075

(March 1, 2011).  In this Final Order, the DEA invoked the "good cause rule" of the CRA, citing

the "adverse health effects associated with these synthetic cannabinoids."  Id. at 11078.

Subsequently, on February 29, 2012, the DEA published a Final Order extending the temporary

---

[14] The notice included a statement that the temporary scheduling of the synthetic cannabinoids did not constitute a "major rule."  75 Fed. Reg. 71637-38.  However, on January 13, 2011, the DEA published a correction to its November 24, 2010, notice, stating that "inclusion of the paragraph relating to the CRA in the Notice of Intent was premature," because the CRA applies only to final rules.  Notice of Intent; correction, 76 Fed. Reg. 2287-88.

scheduling until the earlier of August 29, 2012, or the completion of the final rulemaking process.  Final Order, 77 Fed. Reg. 12201.

On July 9, 2012, President Obama signed into law the Synthetic Drug Abuse Prevention Act of 2012, listing the five synthetics and others as Schedule I drugs, and obviating the need for any administrative rule doing so.

**2. Defendants' Motions to Dismiss for Violations of the Congressional Review Act [Docket Nos. 96, 105, 124, 125]**

Defendant Carlson is charged in Count 18 of the Superseding Indictment with distribution of a controlled substance, to wit, JWH-018, and in Counts 19-20 with distribution and possession with intent to distribute a controlled substance, to wit, AM2201, an alleged analogue of JWH-018.  (See Docket No. 142, at 13-15).  Additionally, all Defendants are charged in Count 21 with conspiracy related to substances alleged to be analogues of JWH-018, and Defendant Carlson is charged in Counts 22-30 with distribution of those alleged analogues. (Id. at 15-18).

Defendants argue that these charges must be dismissed because JWH-018 was never properly scheduled as a controlled substance; consequently, Counts 18-30, each of which relates either to JWH-018 or to an alleged analogue of JWH-018, fail to allege a criminal act.  (See Docket Nos. 96, 105, 124, 125 and accompanying memoranda).

Defendants argue that JWH-018 was never temporarily scheduled because the DEA never provided to Congress and to the Comptroller General the report required by 5 U.S.C. § 801(a)(1)(A).  This argument fails for several reasons.

**a. The DEA's alleged failure to comply with the terms of the CRA is not subject to judicial review.**

First, even assuming *arguendo* that the DEA failed to fully comply with the CRA, such a failure would not entitle Defendants to the dismissal of the charges against them. The CRA expressly provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. Citing this language, courts generally have found that § 805 bars the courts from striking down an agency's action on the basis of a failure to comply with the CRA. See, e.g., In re: Operation of the Missouri River Sys. Litig., 363 F. Supp.2d 1145, 1173 (D. Minn. 2004) (agency's determination under CRA that a rule is not a "major rule" is not subject to judicial review); Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1271 n.11 (10th Cir. 2007) ("The Congressional Review Act specifically precludes judicial review of an agency's compliance with its terms.").[15]

Defendants argue that § 805 merely limits judicial review of *Congress's* "determination[s], finding[s], action[s], or omission[s] under" the CRA, citing for support United States v. Southern Indiana Gas & Electric Company, 2002 WL 31427523, at *4 (S.D. Ind. Oct. 24, 2002), in which the court found ambiguity in the CRA's statutory text and, upon consideration of the CRA's limited legislative history,[16] concluded that § 805 merely "preclu[des] review of determinations made by the [Office of Management and Budget] and Congress under the CRA, not whether or not an agency's decision not to submit a rule in the first place is reviewable." S. Ind. Gas & Elec., 2002 WL 31427523, at *5.

---

[15] See also Montanans for Multiple Use v. Barbouletos, 542 F. Supp. 2d 9, 20 (D. D.C. 2008) (courts lack authority to invalidate agency rules for noncompliance with CRA), aff'd 568 F.3d 225 (D.C. Cir. 2009); Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd., 1998 WL 842181, at *7 (W.D. Tex. June 25, 1998) ("The language [of § 805] could not be plainer, and therefore the [agency's] alleged 'omission' of review 'under this chapter' is not subject to review by this Court."), aff'd 201 F.3d 551 (5th Cir. 2000); United States v. American Elec. Power Serv. Corp., 218 F. Supp. 2d 931 (S.D. Ohio 2002).

[16] Apparently the only "legislative history" of the CRA is a joint statement of its sponsors, which was entered into the Congressional Record. 142 Cong. Rec. S. 3683, 3686 (daily ed. April 18, 1996). Even in citing to this joint statement, the Southern Indiana Gas & Electric court "acknowledge[d] that the lack of formal legislative history for the CRA makes reliance on this joint statement troublesome." 2002 WL 31427523, at *5 n.3.

The Court is not persuaded. "[T]he statute provides for no judicial review of any 'determination, finding, action or omission *under this chapter*,' not '*by Congress under this chapter*.' The Court must follow the plain English." Tex. Sav. & Cmty. Bankers Ass'n v. Fed. Hous. Fin. Bd., 1998 WL 842181, at *7 n.15 (W.D. Tex. June 25, 1998) (emphasis in original). The plain English accords with the prior decision of this District Court that an agency's determination that its action "was not a major rule" under the CRA "is not subject to judicial review," Mo. River Sys. Litig., 363 F. Supp. 2d at 1173 (citing 5 U.S.C. § 805), and with the great weight of the case law. The Court lacks authority to determine whether the DEA's alleged failure to comply with the CRA resulted in JHW-018 not being effectively scheduled and, consequently, the Court lacks authority to dismiss the charges against Defendants on these grounds.

**b. Assuming the DEA's compliance with the CRA is subject to judicial review, the DEA was not required to file the § 801(a)(1)(A) report because its Final Order was not a "rule."**

Defendants repeatedly refer to the DEA's Final Order of March 1, 2011, which temporarily scheduled JWH-018 as a controlled substance, as a "rule," and argue that, as such, it was subject to the reporting requirements of CRA § 801(a)(1)(A). This argument fails because it proceeds from a false premise.

With certain proscribed exceptions, the CRA defines "rule" by reference to the definitions section of the Administrative Procedure Act (APA). 5 U.S.C. § 804(3) ("The term 'rule' has the meaning given such term in section 551.") (exceptions noted at § 804(3)(A)-(C)). The APA, in turn, defines "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5

U.S.C. § 551(4).[17] The term "order" is given a different definition in the APA: "'order' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). "Therefore, it is clear from the plain language of the CRA that rules and orders are two different things." United States v. Reece, 2013 U.S. Dist. LEXIS 92292, at *22 (W.D. La. March 25, 2013), adopted, 2013 U.S. Dist. LEXIS 92372 (W.D. La. July 1, 2013).

Similarly, although neither "rule" nor "order" is defined for purposes of the CSA, 21 U.S.C. § 802, the CSA nonetheless appears to consider them to be separate and distinct agency actions. The CSA generally allows for the Attorney General to schedule or remove a substance "by rule." 21 U.S.C. § 811(a). However, the CSA's temporary scheduling provisions consistently use the word "order" to describe the process of temporarily scheduling a substance. See, e.g., 21 U.S.C. § 811(h). In fact, the CSA's temporary scheduling provisions contain only one (1) instance of the word "rule," and that is to distinguish a temporary scheduling *order* from other *rules* enacted pursuant to the CSA. 21 U.S.C. § 811(h)(5) ("An order issued under paragraph (1) with respect to a substance shall be vacated upon the conclusion of a subsequent rulemaking proceeding initiated under subsection (a) of this section with respect to such substance.").

The plain language of the CRA states that the notice requirements apply to "rule[s]." 5 U.S.C. § 801(a)(1)(A) ("Before *a rule* can take effect . . ." (emphasis added)). However, the CRA contains no such requirement for agency "orders." The CSA authorizes the DEA to temporarily schedule a substance by "order." With respect to JWH-018, the DEA did so. See Final Order, 76 Fed. Reg. 11075 (March 1, 2011). The CRA contains no reporting requirements

---

[17] The APA defines "rule making" as "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).

for agency "orders." Consequently, omissions by the DEA with regard to the CRA's reporting requirements for **rules** were not violated by the DEA's issuance of the ***Final Order*** temporarily scheduling JWH-018 as a Schedule I substance. Accord Reece, 2013 U.S. Dist. LEXIS 92292, at *25 ("[T]he DEA would have been obligated to comply with the notice requirements of Section 801 had it added the five synthetic cannabinoids to schedule I by rule; having added them by order, however, the DEA was not required to provide the notices addressed in Section 801.").

      **c.  Assuming the CRA's notice requirements for "rules" apply equally to "orders," the DEA acted within the CRA's "good cause" exception and, therefore, was not required to provide § 801 notice.**

The DEA's Final Order of March 1, 2011, temporarily scheduling JWH-018 as a controlled substance contains a statement that "it is in the public interest to schedule these cannabinoids immediately because they pose a public health risk." Final Order, 76 Fed. Reg. 11075, 11078 (March 1, 2011). Accordingly, the DEA asserted that its Final Order fell within the "good cause" exception in § 808(2) of the CRA, under which a rule "shall take effect at such time as the Federal agency promulgating the rule determines," irrespective of the CRA's other notice requirements, upon which Defendants rely.

Defendants, citing again to the joint statement of the CRA's sponsors and not to the statutory language of the CRA itself, argue that the DEA's failure to comply with the notice requirements render the Final Order of March 1, 2011, invalid. (See, e.g., Def. Carlson Mem. Supp. Mot. Dismiss [Docket No. 137] at 10, n.9). However, even the legislative history cited by Defendants fails to support their argument. Defendants rely on the following passage in the statement from the CRA's legislative sponsors, which concerns the CRA's "good cause" exception set out in § 808(2):

Although ***the rules described in section 808 shall take effect when the relevant Federal agency determines*** pursuant to other provisions of the law, the federal agency still must submit such rules and the accompany report to each House of Congress and to the Comptroller General as soon as practicable after promulgation. Thus, rules described in section 808 are subject to congressional review and the expedited procedures governing joint resolutions of disapproval. Moreover, the congressional review period will not begin to run until such rules and the accompanying reports are submitted to each House of Congress and the Comptroller General.

Id. (quoting 142 Cong. Rec. S. 3683, 3684 (daily ed. Apr. 18, 1996)) (emphasis added).

Defendants' reliance on this passage from the legislative history is misplaced. The bill's legislative sponsors, themselves, state that rules enacted under the § 808(2) "good cause" exception "take effect when the relevant Federal agency determines," <u>not</u> under the CRA's other general notice requirements as argued by Defendants. That statement, then, is consistent with the text of § 808(2), itself. Although the passage subsequently describes the agency's ongoing responsibility to report to Congress and the Comptroller General, there is no plausible reading of this legislative history that would suggest that a rule enacted pursuant to "good cause" under § 808(2), and which took effect at the time determined by the agency, would somehow and at some undetermined later time be rendered invalid by the agency's failure to report to Congress.

As already noted, the alleged failure of the DEA to comply with the CRA is not reviewable by this Court. Even if this Court could review the DEA's compliance with the CRA, the Court would find that the DEA's Final Order of March 1, 2011, temporarily scheduling JWH-018 as a controlled substance was not subject to the CRA's requirements for "rules." And even if the DEA's Final Order of March 1, 2011, temporarily scheduling JWH-018 as a controlled substance was a "rule" for purposes of the CRA, the Court would find that the DEA properly utilized the "good cause" provision of § 808, and, therefore, that JWH-018 became a

controlled substance on that date. Consequently, Defendants' motions to dismiss because of alleged violations of the CRA, (Docket Nos. 96, 105, 124, 125), should be **DENIED**.

### 3. Defendants' Motions to Dismiss for Violations of 21 U.S.C. § 811(h) [Docket Nos. 127, 156, 175]

Defendants argue that Count 21, as it relates to analogue substances AM2201, UR-144 and XLR11, must be dismissed because those substances were never placed into Schedule I under the Controlled Substances Act (CSA). (See Docket Nos. 127, 156, 175). In particular, Defendants argue that the Drug Enforcement Administration (DEA) never made the findings necessary to temporarily schedule AM2201, UR-144, and XLR11 as controlled substances under 21 U.S.C. § 811(h).

Defendants' argument is a *non sequitur*, because Defendants are not charged under Count 21 with conspiracy to distribute *controlled substances*, but are instead charged with conspiracy to distribute *controlled substance analogues*. (See Superseding Indictment ¶¶ 40-42). Defendants are correct that a substance only becomes a controlled substance as a result of the DEA's compliance with either the general scheduling provisions of 21 U.S.C. § 811(a), or the temporary scheduling provisions of 21 U.S.C. § 811(h). On the other hand, a substance is a controlled substance *analogue* as a result of its particular properties—both its chemical structure, and its pharmacological effects. See 21 U.S.C. § 802(32)(A) (defining "controlled substance analogue"). In fact, Title 21 clearly states that the term "controlled substance analogue" "does not include [] a controlled substance." 21 U.S.C. § 802(32)(C)(i). Accordingly, "[t]he [Analogue Act] does not . . . require the DEA to classify a substance as a controlled substance analogue before the substance falls under its purview." United States v. Sullilvan, 714 F.3d 1104, 1107 (8th Cir. 2013).

Consequently, the Court recommends that Defendants motions to dismiss Count 21 alleging that the DEA failed to comply with the requirements of 21 U.S.C. § 811(h), (Docket Nos. 127, 156, 175), be **DENIED**.

### 4. Defendants' Motions to Dismiss Count 21 for Improper Delegation of Authority [Docket Nos. 131, 158, 177]

Defendants argue that Congress has unconstitutionally delegated to the DEA both the authority to make scientific evaluations of alleged drugs, as well as, enforcement authority over those drugs. (See Docket Nos. 131, 158, 177). Defendants argue that the Court should hold that any determination that a substance is a controlled substance analogue first have the approval, based on "scientific, medical, [and] pharmacological tests," of the Secretary of Health and Human Services. (Def. Haugen's Mem. Supp. Mot. Dismiss for Violation of Delegation of Authority [Docket No. 159] at 1). However, Defendants cite no authority for their arguments, aside from the general proposition that our Constitution does not vest legislative and executive authority in the same branch of government.[18]

The Court is well aware of the doctrine of separation of powers, which "focuses on the distribution of powers *among* the three coequal Branches; it does not speak to the manner in which authority is parceled out within a single Branch." Touby v. United States, 500 U.S. 160, 167-68 (1991) (internal citation omitted) (emphasis in original). In Touby, the Supreme Court rejected the argument that Congress should have divided authority under the Controlled Substances Act among different Executive agencies, holding that "Petitioner's argument that temporary scheduling authority should have been vested in one executive officer rather than another does not implicate separation-of-powers concerns; it merely challenges the wisdom of a legitimate policy judgment made by Congress." Id. at 168. Defendants in the present case

---

[18] Defendants cite to Talk America v. Michigan Bell Tel., --- U.S. ---, 131 S.Ct. 2254 (2011) (Scalia, J., concurring), for this general proposition.

merely re-assert the same argument made by the petitioners in <u>Touby</u>—an argument that has been unanimously rejected by those courts that have considered it.  <u>See, e.g.</u>, <u>United States v. Granberry</u>, 916 F.2d 1008, 1010 (5th Cir. 1990) ("[T]here is no basis on which to complain that the analogue statute constitutes an impermissible delegation of legislative power"); <u>United States v. Pastor</u>, 557 F.2d 930, 939-41 (2d Cir. 1977) (finding the delegation of authority to be "constitutionally valid"); <u>United States v. Lane</u>, 2013 WL 3199938, at *2 n.1 (D. Ariz. June 24, 2013) ("The Court agrees with the Fifth Circuit that 'there is no basis on which to complain that the analogue statute constitutes an impermissible delegation of legislative power.'" (quoting <u>Granberry</u>)).

The Court recommends that Defendants' motions to dismiss on the basis of unconstitutional delegation of authority be **DENIED**.

### 5. Defendants' Motions to Dismiss Count 21 for Violation of Executive Order 12988 [Docket Nos. 135, 162, 179]

Defendants argue that the DEA failed to provide notice of the effects that its Temporary Scheduling Order of March 1, 2011, would have on other federal laws, as required by Executive Order 12988.  (<u>See</u> Docket Nos. 135, 162, 179).  Defendants assert that because of this alleged failure to provide notice of the Order's effects on other federal laws, "the DEA is precluded from prosecuting" the analogues listed in that Order under 21 U.S.C. § 813.  (Def. Haugen's Mem. Supp. Mot. Dismiss for Exec. Order 12988 Violation [Docket No. 163] at 2).

Even assuming that the DEA failed to fully comply with Executive Order 12988, Defendants cite to no authority that would support their argument that such a failure would warrant dismissal of the charges against them.  In fact, such an argument is contrary to the plain language of the Executive Order.  Executive Order 12988 does require that "each agency formulating proposed legislation and regulations shall make every reasonable effort to ensure:

30

. . . (2) that the regulation, as appropriate, . . . (B) specifies in clear language the effect on existing Federal law or regulation, if any." Executive Order 12988 (Feb. 5, 1996), <u>published at</u> 61 Fed. Reg. 4729, 4731-32 (Feb. 7, 1996). However, notwithstanding the passage cited above (and relied upon by Defendants,) Executive Order 12988 clearly states that it creates no private right, and cannot serve as the basis for judicial review of executive action:

> **Sec. 7. No Private Rights Created.** This order is intended only to improve the internal management of the executive branch in resolving disputes, conducting litigation in a reasonable and just manner, and reviewing legislation and regulations. ***This order shall not be construed as creating any right or benefit, substantive or procedural, enforceable at law or in equity by a party against the United States, its agencies, its officers, or any other person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.*** Nothing in this order shall be construed to obligate the United States to accept a particular settlement or resolution of a dispute, to alter its standards for accepting settlements, to forego seeking a consent decree or other relief, or to alter any existing delegation of settlement or litigating authority.

<u>Id.</u> at 4733 (Feb. 7, 1996) (emphasis added).[19] Defendants provide no authority to the contrary.

Consequently, the Court recommends that Defendants' motions to dismiss alleging a violation of Executive Order 12988, (Docket Nos. 135, 162, 179), be **DENIED**.

> **6. Defendants' Motions to Dismiss because the Synthetic Drug Abuse Prevention Act of 2012 Was Not in Effect at the Times Alleged in the Superseding Indictment [Docket Nos. 96, 105, 124, 176, 184]**

All three Defendants argue that the SDAPA did not take effect on July 9, 2012, when the FDASIA was signed into law, but instead took effect on October 12, 2012, when the "slip law"

---

[19] Although the Court found no case law concerning judicial review of Executive Order 12988, courts considering similar language in various predecessor executive orders held that those executive orders did not provide a basis for judicial review of agency action. <u>See, e.g.</u>, <u>Trawler Diane Marie, Inc. v. Brown</u>, 918 F. Supp. 921 (E.D. N.C. 1995) ("[P]laintiff has no right of action to challenge the Secretary's compliance with E.O. 12866"), <u>aff'd</u> 91 F.3d 134 (4th Cir. 1996); <u>Michigan v. Thomas</u>, 805 F.2d 176, 187 (6th Cir. 1986) ("Given this clear and unequivocal intent that agency compliance with Executive Order 12,291 not be subject to judicial review, we hold that the Order provides no basis for rejecting the EPA's final action. The Order was intended 'to improve the internal management of the Federal government' and not to confer rights judicially enforceable in private litigation."); <u>cf.</u> <u>In re Surface Minig Regulation Litig.</u>, 627 F.2d 1346, 1357 (D.C. Cir. 1980) (executive orders that required statement concerning potential inflationary impact of regulations did not provide legal framework for private civil actions).

of the FDASIA was published as Public Law No. 112-144.  However, different Defendants apply this argument to different counts against them.

### a.  Defendant Carlson

Counts 19 and 20 of the Superseding Indictment charge Defendant Carlson with violations of the SDAPA between July 9, 2012, and July 25, 2012.  (See Docket No. 142, at 14-15).  Defendant Carlson argues that those counts must be dismissed because the SDAPA was not yet in effect and, consequently, that he cannot be charged with violating a law that was not yet in effect at the time he was alleged to have violated it.  (See Def. Carlson's Mot. Dismiss [Docket No. 96]; Def. Carlson's Mem. Supp. Mot. Dismiss [Docket No. 137] at 22-25).

Defendant Carlson acknowledges that there is "some case law supporting the proposition that a law takes effect on the date it is signed by the President."  (Def. Carlson Mem. Supp. Mot. Dismiss [Docket No. 127] at 22).  Nonetheless, he argues, without citation to any authority, that under 1 U.S.C. § 113[20] a statute must be published in order to be admissible in evidence.

"It is well established that, absent a clear direction by Congress to the contrary, a law takes effect on the date of its enactment."  Gozlon-Peretz v. United States, 498 U.S. 395, 404 (citing, among others, Arnold v. United States, 13 U.S. 104, 9 Cranch 104, 119-20 (1815)).  It is axiomatic that "the date of enactment" is "the date it was signed by the President."  Wright v.

---

[20] 1 U.S.C. § 113 provides:

> The edition of the laws and treaties of the United States, published by Little and Brown, and the publications in slip or pamphlet form of the laws of the United States issued under the authority of the Archivist of the United States, and the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence of the several public and private Acts of Congress, and of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof.

General Dynamics Corp., 1992 WL 101761, at *1 (E.D. Ark. Mar. 3, 1992). This simple

principle has a long pedigree in Supreme Court jurisprudence.[21]

This rule applies to the SDAPA, notwithstanding the fact that other specific sections of

the FDASIA contain unique effective dates *for those sections*. The Supreme Court explained

why in Gozlon-Peretz, a case concerning the Anti-Drug Abuse Act of 1986 ("ADAA"):

> Turning to the text of the statute, we note that § 1002, like many other
> congressional enactments, contains no provision for its effective date. Nor is
> there an effective date specified for the ADAA as a whole. Congress' silence in
> this regard contrasts with the express effective date provisions for other discrete
> sections of the ADAA. "Where Congress includes particular language in one
> section of a statute but omits it in another section of the same Act, it is generally
> presumed that Congress acts intentionally and purposefully in the disparate inclusion
> or exclusion."

498 U.S. at 404 (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (internal citations

omitted). In the present case, as in Gozlon-Peretz, the FDASIA does not specify an effective

date for the whole of the act, nor is there a specific effective date for those parts of the FDASIA

that constitute the SDAPA. Consequently, the SDAPA became effective on July 9, 2012, when

it was signed by the President, notwithstanding the fact that certain *other* sections of the

FDASIA did not take effect until the later dates specified in those sections.

Additionally, Defendant Carlson's reliance on 1 U.S.C. § 113 is misplaced, as that statute

speaks not to when a statute takes effect, but rather merely states that a properly published statute

is self-authenticating if introduced at trial as evidence. The Supreme Court has for almost 200

years recognized that a law properly enacted need not be *published* in order to take effect.

Arnold, 113 U.S. at 119 ("It is contended that this statute did not take effect . . . until it was

---

[21] See, e.g., Matthews v. Zane, 20 U.S. (7 Wheat.) 164, 211 (1822) ("The known rule being, that a statute for the commencement of which no time is fixed, commences from its date . . ."); Gardner v. The Collector, 73 U.S. (6 Wall.) 499, 504 (1868) ("The date of the President's approval of the bill is undoubtedly the date at which it became a law . . .").

formally promulgated and published.  We cannot yield asset to this construction.").  Defendant

Carlson provides no authority to the contrary.

Finally, Defendant Carlson notes that a former Assistant U.S. Attorney, John Parr (Mr.

Parr), mistakenly stated in an Internet posting on the website of the Ohio State Journal of

Criminal Law[22] that the SDAPA's "effective date was October 1, 2012."  See John Parr, The

Synthetic Drug Abuse Prevention Act: There's Still Heavy Lifting to Do Hurdles in Prosecuting

Synthetic Drug Cases (undated), http://moritzlaw.osu.edu/students/groups/osjcl/amici-blog/the-

synthetic-drug-abuse-prevention-act-theres-still-heavy-lifting-to-do-hurdles-in-prosecuting-

synthetic-drug-cases/ (last visited July 13, 2013).  Defendant Carlson does not assert that he

relied upon Mr. Parr's representation that the SDAPA did not take effect until October 1, 2012,[23]

but instead argues that "if the effective date of the SDAPA is so confusing that it fooled a former

assistant United States attorney of Mr. Parr's experience, as well as the faculty and student peer-

reviewers at [The] Ohio State University, the new law was obviously too confusing to meet due

process requirements and give fair warning to this Defendant."  (Def. Carlson's Mem. Supp.

Mot. Dismiss [Docket No. 137] at 24-25).  However, he provides no authority for the dubious

proposition that a single author's factual error—no matter the past prosecutorial credentials of

---

[22] Defendant Carlson states that Mr. Parr made this statement in a "published [] Law Review article in the Ohio State Journal of Criminal Law, a peer-reviewed faculty-student cooperative venture published by the Michael E. Moritz College of Law at [The] Ohio State University."  (Def. Carlson's Mem. Supp. Mot. Dismiss [Docket No. 137] at 24).  A review of the Journal's  archives and its website, however, reveals that the "article" was not published in the Ohio State Journal of Criminal Law, but instead was posted on a portion of the Journal's website called the "*Amici* Blog."

[23] To the extent that Defendant Carlson should assert such an argument, the misstatement in Mr. Parr's internet posting is insufficient to sustain such a defense, as Mr. Parr expressly stated that the article reflected his "personal opinion and perception," and not that of the U.S. Department of Justice or any office or section thereof.  See Parr, supra.  Thus, the misstatement in the internet posting regarding the SDAPA's effective date is not a misstatement by the government, but instead is merely a misstatement by a private individual.  "It is the authority, whether apparent or actual, of the *government official* that is crucial to the entrapment by estoppel defense."  United States v. Austin, 915 F.2d 363, 366 (1990).  Where, as here, the defendant appears to allege reliance upon the advice of a private party, that is insufficient.  Id. at 366-67.  See also Part II.B.10, infra.

the author—is evidence sufficient for a court to invalidate a statute duly passed by Congress and signed into law by the President.

The SDAPA, as part of the FDASIA, was signed into law by the President on July 9, 2012; and unlike other sections of the FDASIA, the SDAPA contains no language that would indicate that Congress intended for it to take effect on any date other than its date of enactment. Consequently, the Court finds that the SDAPA took effect on July 9, 2012, and recommends that Defendant Carlson's motion to dismiss, [Docket No. 96], as it relates to the effective date of the SDAPA, be **DENIED**.

### b. Defendants Haugen and Gellerman

Count 21 of the Superseding Indictment alleges that all three Defendants conspired to distribute controlled substance analogues between March 1, 2011, and September 21, 2012. (See Docket No. 142 at 15-16). Defendants Haugen and Gellerman, notwithstanding the fact that Count 21 does not charge them with violating the SDAPA, argue that Count 21 against them must be dismissed because of the effective date of the SDAPA, (see Docket Nos. 105, 124, 176, 184), advancing the same arguments made by Defendant Carlson, and advancing one additional argument.

The Court considers Defendants' argument here as a *non sequitur*, because Count 21 does not charge Defendants Haugen and Gellerman with violating the SDAPA. Nonetheless, even in the event that Defendants Haugen and Gellerman could demonstrate the relevance of the SDAPA to the analogue charges they face in Count 21, the Court would find their arguments unavailing.

The Court need not revisit the arguments, made by Defendant Carlson and joined by Defendants Haugen and Gellerman, that the SDAPA is so confusing with regard to its effective date that Defendants' due process rights are violated, (see, e.g., Def. Haugen's Mem. [Docket

No. 186] at 2-3), or that the SDAPA did not take effect until it was published as a "slip law," (see, e.g., Id. at 6-9), as the Court has already rejected these arguments as advanced by Defendant Carlson.[24]

Additionally, Defendants Haugen and Gellerman advance a broader due process argument with several novel parts. First, Defendants Haugen and Gellerman argue that if the DEA had implemented the SDAPA's provisions as an administrative "rule," then it would qualify as a "major rule" under the CRA and, therefore, that it should not take effect until sixty (60) days until after being enacted. (Id. at 3-5). Of course, the obvious retort to this assertion is that the SDAPA was *not* implemented by the DEA as a rule, but instead, it was passed by both Houses of Congress and signed into law by the President. Thus, the CRA does not apply.

Seemingly aware of this obvious flaw in their argument, Defendants Haugen and Gellerman baldly assert that the Court should nonetheless *sua sponte* require a sixty-day public notice period before Acts of Congress take effect, arguing that "[t]here is no substantive difference between Congress passing a law directly or Congress passing a law indirectly by not overruling a new law enacted by a Federal Agency." (Id. at 5). Defendants Haugen and Gellerman even go so far as to assert that this need for a public notice period is greater for laws, like the SDAPA, that are "passed in the Summer and especially around the 4th of July, when many people go on vacation," because "a person could take his family to the Boundary Waters for a two week canoe trip on July 4, 2012, and return an unwitting felon without any notice a new criminal law was passed." Id. Notwithstanding the Defendants' fanciful hypothetical, the Court declines this invitation to rewrite both the U.S. Code and the U.S. Constitution to provide for a public notice period after a law's enactment before that law can take effect.

_____

[24] See Part I.B.6.a, supra.

Consequently, the Court recommends that these motions (Docket No. 142, at 15-16) be **DENIED**.

### 7. Defendants' derivative argument that Counts 21-29 of the Superseding Indictment must be dismissed, because Count 18 of the Superseding Indictment must be dismissed

Defendants argue that Counts 21-29 of the Superseding Indictment fail as a matter of law because JWH-018 was not a controlled substance and "it is not a violation of Federal Law to sell a substance that is an analogue of a substance not otherwise controlled." (Mot. to Dismiss Indictment [Docket No. 96] at 1).

However, having found that JWH-018 was a controlled substance on the alleged dates that Defendants took acts related to controlled substance analogues, and that Count 18 of the Superseding Indictment should stand, as already discussed above, the Court finds that Defendants' derivative argument for also dismissing Counts 21-29 must also fail.

### 8. Defendants' argument that the CSA's analogue provisions are unconstitutionally vague as applied to Defendants [Docket Nos. 96, 133, 160, 178]

"A controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." 21 U.S.C. § 813.

> Except as provided in subparagraph (C), the term "controlled substance analogue" means a substance--
>     (i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;
>     (ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or
>     (iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant,

depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

21 U.S.C. § 802(32)(A).

"Under [21 U.S.C. § 802(32)(A)], a drug becomes a controlled substance if it has a chemical structure substantially similar to that of a controlled substance, and either has a substantially similar effect on the user's central nervous system, or a relevant someone represents that it has or intends it to have such an effect." United States v. McKinney, 79 F.3d 105, 107-08 (8th Cir. 1996), vacated on other grounds, 520 U.S. 1226 (1997).

Defendant Haugen and Defendant Carlson submitted virtually the same memorandum in support of their respective motions to dismiss all of the Controlled Substance Act analogue counts against them. (See Docket Nos. 137, 170). While Defendant Gellerman failed to file any memorandum in support of his motion to dismiss Count 21, at the hearing on the motions, he adopted the various arguments advanced by Defendants Carlson and Haugen.[25] Therefore, the Court collectively considers all of the offered arguments for dismissing the CSA counts.

Defendants all argue that the above statute is void for vagueness because of the words "substantially similar." (See Mem. of Points and Authorities [Docket No. 137] at 28-33); (Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 1-6). Defendant Haugen also argues that the statute is void for vagueness because of the words "human consumption." (See Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 6-8). The Court addresses each specific challenge in turn.

---

[25] By reference to "arguments" adopted by Defendant Gellerman, the Court understands him to have adopted both the oral and written arguments advanced by Defendants Carlson and Haugen.

### a. Defendants' argument that the words "substantially similar" render the CSA statute void for vagueness

As already explained above, under the Fifth Amendment's guarantee that every citizen is entitled to due process, "vague statutes are void." Washam, 312 F.3d at 929. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." Connally, 269 U.S. at 391. The law must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at 108. "In determining whether a statute is unconstitutionally vague on the facts at hand," the Court applies a two-part test: 1) "the statute must provide adequate notice of the proscribed conduct"; and 2) "the statute must not lend itself to arbitrary enforcement." Washam, 312 F.3d at 929. However, the Court begins "with the presumptive validity of the statute." United States v. Ghane, 673 F.3d 771, 777 (8th Cir. 2012).

Defendant Haugen argues that the words "substantially similar" render the controlled substance analogue statute void for vagueness because the phrase "substantially similar . . . has no scientifically accepted meaning and cannot be determined by any generally accepted test or measurement." (Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 1).[26]

First, Defendant Haugen argues that "[s]ubstantially similar is simply not a meaningful term in the science of chemistry; rather it is the product of legislative creation." (Id. at 1). Therefore, she asserts, "scientists have never agreed on any standardized test for determining whether two substances are 'substantially similar' in molecular structure." (Id.)

---

[26] The Court notes that Defendant Haugen's memorandum of law [Docket No. 161], filed in support of motion Docket No. 160, with the exception of an added "Facts" section, is virtually a carbon copy of Defendant Haugen's memorandum of law filed at Docket No. 134, filed in support of motion Docket No. 133. Thus, the Court addresses them collectively.

However, in considering whether the statute is impermissibly vague, the Court looks to the legal definition of a statutory term, not the scientific definition. See United States v. Brown, 279 F. Supp.2d 1238, 1240 (S.D. Ala. 2003) ("Since the Analogue Act does not indicate that the term 'substantially similar' is to be defined as it is used scientifically, the court will interpret those words as they are used in everyday language."). In other words, the Court looks to the words and determines if someone of common intelligence would be able to understand what conduct has been prohibited. Defendant Haugen argues, however, that whether any of the charged chemicals are controlled substance analogues "is not something [that] could have [been] known" and "will not be conclusively known until a verdict is rendered by a jury, should that eventuality ever occur." (Mem. in Supp. of Mot. to Dismiss at 2). As such, Defendant Haugen argues, "the Attorney General has forced Defendants to assume the risk of how a jury might apply the 'substantially similar' standard to substances never before subjected to legislative, regulatory or judicial scrutiny." (Id.) Essentially, Defendant Haugen is arguing that an individual cannot know if a substance falls within the definition of a controlled substance analogue until the jury answers the question. In support of her argument, Defendant Haugen relies on United States v. Ansaldi, 372 F.3d 118, 123 (2d Cir. 2004). There, the Second Circuit stated that "[i]t is an interesting question under what circumstances a statute that depends on the resolution of a factual question about which reasonable juries can disagree is specific enough to withstand a vagueness challenge." Ansaldi, 372 F.3d at 123. The Ansaldi court stated, however, that it need not answer the question because an ordinary person would have been on notice of the illegality of the substance without the jury's confirmation. See Id. The court explained that:

> Juries are often required to determine not only whether certain conduct occurred but also whether the conduct falls within the definition of a statute. In fact, when considering an obscenity law, the Supreme Court has gone as far as saying that "the possibility that different juries might reach different conclusions as to the

same material does not render the statute unconstitutional." Smith v. United States, 431 U.S. 291, 309, 97 S.Ct. 1756, 52 L.Ed.2d 324 (1977). Of course, if a statute's terms are so vague that a jury's determination is likely to be arbitrary, and, consequently, those terms would not allow an ordinary person to understand what conduct is prohibited, then the statute may be unconstitutional. That, however, is nothing more than a restatement of the proposition that statutes must not be unconstitutionally vague—the issue we address here.

Id. at n. 2.

However, even if one cannot be absolutely sure that a substance is "substantially similar," within the meaning of the statute until a jury so determines, the Eighth Circuit has rejected the argument that this renders the controlled substance analogue statute void for vagueness. See McKinney, 79 F.3d at 107. In McKinney, the Eighth Circuit explained that "[w]hile doubts as to the applicability of the language in marginal fact situations may be conceived, we think that the statute gave defendant adequate warning that his conduct was a criminal offense" and that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree." 79 F.3d at 108 (internal quotation marks omitted); see also United States v. Niemoeller, 2003 WL 1563863, at *4 (S.D. Ind. 2003) ("Those concepts may not provide absolute certainty in every case in which a person seeks to experiment in reaching the outermost boundaries of lawful conduct, but that is not the standard for due process."). Indeed, other courts have emphasized that numerous other considerations can be taken into account in determining substantial similarity of the substances, including the "effects on the human body." See Washam, 312 F.3d at 932; Brown, 279 F. Supp.2d at 1243 ("[E]ffects on the human body under the second part of the statute may be considered when determining substantial similarity of chemical structure under the first part of the statute.").

Additionally, as the Eighth Circuit held in Sullivan, one of the elements the Government is required to prove at trial is that the Defendant "knew he was in possession of a controlled

substance analogue."  714 F.3d at 1107; see also United States v. Turcotte, 405 F.3d 515, 527

(7th Cir. 2005).  Such a showing may rely, in part, on the defendant's conduct in dealing or

addressing the substance with others.  See Sullivan, 714 F.3d at 1107 (holding that "[a]

reasonable juror could find [the defendant] knew he was in possession of a controlled substance

analogue" because "[w]hen [a police officer] asked [the defendant] whether the vehicle

contained anything illegal, [the defendant] told him the vehicle contained bath powder").

Essentially, then, the notice of which Defendant Haugen complains has been incorporated into

one of the elements the Government has the burden of proving at trial.  See Turcotte, 405 F.3d at

531.  And if Defendant Haugen adamantly stands firm that she had no knowledge of the

substantial similarity of the substance, she will have the opportunity to present such evidence,

put the Government to its full burden, and submit evidence to show that she did not "kn[o]w

[s]he was in possession of a controlled substance analogue."  Sullivan, 714 F.3d at 1107.

Second, Defendant Haugen argues that "[t]here is no consensus or agreed upon scientific

standard for determining whether one substance is 'substantially similar' to another."  (Mem. in

Supp. of Mot. to Dismiss [Docket No. 134] at 2).[27]  In support of this proposition, Defendant

Haugen cites to testimony from the Government's expert, Dr. Terrance Boos, in United States v.

Fedida, No. 6:12-cr-209-Orl-37DAB, in which Mr. Boos testified that there is a lack of

consensus within the scientific community on the "methodology that [is] utilized to determine

whether or not those compounds are substantially similar within the definition of the Act."  (Id.

at 3).  The crux of this argument is that a substance can be taken to several different chemists and

they will all map the same molecular structure but may not all agree on whether it is

---

[27] Defendant Carlson appears to join in this argument and cites some additional evidence of lack of consensus, (see Mem. of Points and Authorities [Docket No. 137] at 30); thus, the Court addresses them collectively.

"substantially similar" to a controlled substance. (See Mem. of Points and Authorities [Docket No. 137] at 31).

Defendant Haugen's argument regarding a lack of consensus of a definition of "substantially similar" in the chemistry community overlooks the fact, as already discussed above, that the question of whether a substance is substantially similar to another substance is not a scientific question and looks beyond the mere physical properties of a substance. Furthermore, it has been rejected by the Eighth Circuit in McKinney. In McKinney, the Court framed the defendant's argument as follows:

> Mr. McKinney argues that the statute is unconstitutionally vague because there is a lack of scientific consensus that aminorex and phenethylamine are analogues. . . . He urges that if experts disagree as to whether the chemical structure of one drug is substantially similar to a controlled substance, then the statute is unconstitutionally vague as to that drug.

79 F.3d at 108. The Court then rejected the argument, explaining that "a reasonable layperson could, for example, have examined a chemical chart and intelligently decided for himself or herself, by comparing their chemical diagrams, whether the chemical structure of two substances were substantially similar." Id. This holding has been reaffirmed by the Eighth Circuit and followed by numerous courts. See Washam, 312 F.3d at 931 ("We have held that all experts need not agree on whether two drugs' chemical structures are 'substantially similar' in order to affirm a conviction under the Analogue Statute."); United States v. Orchard, 332 F.3d 1133, 1137-38 (8th Cir. 2003); United States v. Bamberg, 478 F.3d 934, 938 (8th Cir. 2007); see also Brown, 279 F. Supp.2d at 1241 (relying on McKinney and holding that "it is apparent to the court that the phrase 'substantially similar,' as contained in the Analogue Act, does not hinge on how a scientist would interpret the term, but how ordinary people use the language"); United States v. Klecker, 348 F.3d 69, 72 (4th Cir. 2003); United States v. Carlson, 87 F.3d 440, 444

(11th Cir. 1996); United States v. Granberry, 916 F.2d 1008, 1010 (5th Cir. 1990) (holding that there was "nothing vague about the statute" at issue here); United States v. Desurra, 865 F.2d 651, 653 (5th Cir. 1989).[28]

Defendant Haugen's assertion that there is a purported lack of agreement or consensus on a methodology to determine substantial similarity may be a basis to attempt to discredit an expert's opinion at trial—it does not, however, render the CSA impermissibly vague. See Brown, 279 F. Supp.2d at 1242 ("[D]iffering methodology in reaching a conclusion on substantial similarity does not render the statute vague, but may tip the scales one way or the other on the issue in the mind of the trier of fact depending on the relative strength of the analysis"). Indeed, the very case that Defendant Haugen cites for the propositions that there is a lack of consensus in the scientific community on when a substance is substantially similar in its chemical structure or its effects to a controlled substance actually rejected Defendant's argument. See United States v. Fedida, 2013 WL 1831991, at *8 n.6 (M.D. Fla. May 1, 2013) ("The Court recognizes that there appears to be a principled disagreement among the experts concerning the significance of the replacement of the naphthyl moiety in JWH–18 with the tetramethylcyclopropyl moiety present in UR–144 and XLR11. The differing opinions of experts on the issue of substantial similarity does not, however, render the Analogue Act vague. See, e.g., United States v. Brown, 279 F.Supp.2d 1238, 1241–42 (S.D. Ala. 2003). Rather, such testimony should be presented to the trier of fact, who will decide the relative strengths and merits of the methodologies supporting the experts' opinions."); see also United States v. Fedida, 2013 WL 2712363, at *1 (M.D. Fla. Jun. 11, 2013) (denying the defendant's motion to exclude

_____

[28] Defendant Haugen's argument that any two-dimensional "'stick and letter' drawings of molecular structure to illustrate structural similarity . . . are too simplistic [and] . . . should be excluded from evidence," (Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 6), is not the proper province of a motion to dismiss the Superseding Indictment, but is better left to a motion in limine. Thus, the Court does not consider this argument.

the expert testimony of Mr. Boos regarding his opinion addressing substantial similarity because "Defendant's arguments go more toward the weight that should be given to Dr. Boos' opinions by the trier of fact than to the admissibility of Dr. Boos' opinions and testimony").

Finally, Defendant Haugen argues that there is the additional problem that it is impossible to determine, under the second prong of the CSA statute, whether the substance has a substantially similar effect because there have not been sufficient studies demonstrating these substances' effects on the human body. (Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 3-4). This, however, again hinges on the exact same analysis above pertaining to the definition of a "substantial similarity." Whether there have been studies considering the effects of the alleged substances, whether such studies would have come to the same conclusion, and similar inquiries may be relevant to the weight of evidence presented at trial but do not render the statute impermissibly vague.

Defendant Carlson makes the additional argument that without notice from "either the legislative history of the Analogue Act itself, or the statute prohibiting the controlled substance at issue, or a regulation issued pursuant thereto . . . that the subject analogue would be prohibited," the statute is void for vagueness. (See Mem. of Points and Authorities [Docket No. 137] at 29).[29] This argument is directly contrary to the underlying purpose of the statute. Numerous courts have explained that the purpose of the CSA statute's analogue provision is precisely so that the Government need not be required to specifically identify each substance that is considered a controlled substance analogue. As explained by the Eighth Circuit in McKinney,

---

[29] Defendant Carlson appropriately begins his argument by acknowledging that substantial authority exists specifically rejecting his argument. (Mem. of Points and Authorities [Docket No. 137] at 28) ("To be sure, numerous courts have upheld the validity of the analog statute, against a vagueness challenge."). He argues, however, that all of these cases required "that either the legislative history of the Analogue Act itself, or the statute prohibiting the controlled substance at issue, or a regulation issued pursuant thereto, gave to the public notice that the subject analogue would be prohibited." (Id. at 28-29). For the reasons discussed below, his argument fails.

"[b]ecause manufacturers of illegal drugs have become adept at tinkering with the molecular structure of [scheduled] controlled substances while retaining the effects that those substances produce, the analogue statute is aimed at prohibiting innovative drugs before they are specifically listed in the schedules as controlled substances." 79 F.3d at 107. A requirement that the Government identify and label each analogue individually before a prosecution could be pursued would essentially eviscerate the analogue statute, and such an argument has been repeatedly rejected by federal courts, including the Eighth Circuit. See Washam, 312 F.3d at 932 ("Congress did not state that distributors of analogues must be warned prior to enforcement of the statute."); Sullivan, 714 F.3d at 1107 ("The CSAEA does not, however, require the DEA to classify a substance as a controlled substance analogue before the substance falls under its purview."); United States v. Hofstatter, 8 F.3d 316, 322 (6th Cir. 1993) ("It is true that the statute does not specifically list the chemicals that are controlled substance analogues. Given the creativity of amateur chemists, such a list might well be impossible to compile. . . . ); United States v. Fisher, 289 F.3d 1329, 1336 n.11 (11th Cir. 2002) ("Therefore, under current law, all substances that meet the definition of a controlled substance analogue are illegal. No list of controlled substance analogues is necessary. Failure to specifically identify a substance as a controlled substance analogue is of no consequence.").

To the extent that Defendant Carlson argues that he had no actual subjective notice that the alleged substances are controlled substance analogues because their chemical structure is not substantially similar to the chemical structure of a controlled substance, such an argument is a direct challenge to the sufficiency of the evidence that the Government will have to marshal and show at trial; he may make such a challenge to the sufficiency of the evidence after the Government has been provided an opportunity to present its evidence regarding the substantial

similarity of the alleged controlled substances and their alleged analogues.  See United States v.

Ferro, 252 F.3d 964, 968 (8th Cir. 2001) (explaining that "[t]he government is entitled to marshal

and present its evidence at trial, and have its sufficiency tested by a motion for acquittal pursuant

to Federal Rule of Criminal Procedure 29" and that the Court "cannot approve dismissal of an

indictment on the basis of predictions as to what the trial evidence will be."  (quoting United

States v. DeLaurentis, 230 F.3d 659, 661 (3d Cir. 2000)); United States v. Sullivan, 2011 WL

3957425, at *2 (D. Neb. Aug. 17, 2011) (holding that the issue of "[w]hether the chemical

structures of [the alleged] substances are 'substantially similar to the chemical structure' of a

schedule I or II controlled substance is an issue of fact to be resolved at trial" and explaining that

such "factual issues cannot be resolved on a motion to dismiss"), adopted, 2011 WL 3957271, at

*1 (D. Neb. Sept. 7, 2011); Klecker, 348 F.3d at 72 ("Whether a particular substance qualifies as

a controlled substance analogue is a question of fact."); Niemoeller, 2003 WL 1563863, at *6

(explaining that "[w]hether the government may ultimately meet its burden remains [for trial]");

Fedida, 2013 WL 1831991, at *2 (concluding that the defendant's challenges regarding the

substantial similarity of the chemical structure of the alleged substances were "challenges to the

sufficiency of the evidence, not the Indictment").[30]  In a case such as this one, such a challenge is

most appropriate after the Government has been afforded an opportunity to present its case-in-

_____

[30] In its memorandum, the Government stated that Defendants had expressed some intent on requesting an
evidentiary hearing regarding this issue.  (United States' Omnibus Resp. [Docket No. 202] at 78).  Defendants have
made no request to the Court for an evidentiary hearing and the Court need not consider the issue. The Court notes,
however, that even at this stage, the Government has presented sufficient evidence from which a reasonable juror
could conclude substantial similarity between the alleged substances and a controlled substance, such as to
overcome Defendants' motions to dismiss.  (See Decl. of Terrence L. Boos, Ph.D. [Docket No. 202, Ex. 7] at 2-22);
(Decl. of Jordan Trecki, Ph.D. [Docket No. 202, Ex. 8] at 1-9); Fedida, 2013 WL 1831991, at *8 (holding that "[a]
reasonable layperson who examines the two-dimensional drawings of the chemical structures of UR–144, XLR–11,
and JWH–18 could plausibly conclude that such substances are substantially similar" and that "[t]his is all that is
required").  Indeed, even one of the articles filed by Defendants in support of their entrapment by estoppel argument,
appears to suggest that they may have actual notice that at least some of the substances at issue could be considered
controlled substance analogues.  (See Docket No. 107, Ex. 19) (a February 2012 report from a private chemical
company noting that while AM-2201 is a "substance not currently covered under the Federal Schedule . . . [it] may
be considered to be [an] analog[ue] (a chemical compound with a slightly altered chemical structure")).

chief because the as-applied unconstitutional argument may very well be preempted if the Government can show actual notice. See Washam, 312 F.3d at 930 (finding appeal in the conclusion that a defendant who has actual notice that his conduct is illegal "cannot claim that the statute is void for vagueness as applied to him"); Turcotte, 405 F.3d at 529 ("[H]aving acknowledged that he *knew* he was selling substances containing GBL, Turcotte cannot then turn around and claim that he had no knowledge of GBL's status as an analogue of GHB." (emphasis in original)). The Court further notes that as already explained above, contrary to Defendant's suggestion, the Government is not merely constrained to a comparison of the molecular structure between the two substances in making such a showing.

In summary, the Court agrees with the overwhelming weight of case authority, including the Eighth Circuit, that the statute defining a controlled substance analogue is constitutional regardless of the fact that Defendants claim they personally were not specifically warned,[31] prior to the prosecution, that they may be prosecuted for the sale or distribution of the alleged substances and that there may be a lack of consensus in the scientific community with regard to the methodology of analyzing the similarities between two substances.

### b. Defendant Haugen's argument that the words "human consumption" render the controlled substance statute void for vagueness

Defendant Haugen argues that the words "human consumption" void the CSA statute because the phrase is not defined in the statute and "has multiple different meanings," and thus, "the public has to guess what meaning of the term 'human consumption' Congress intended." (Mem. in Supp. of Mot. to Dismiss [Docket No. 134] at 6-8).[32] Defendant does not appear to be

---

[31] Actual, personal prior notice by the Government directly to a specific defendant has never been a prerequisite before a prosecution can successfully avoid a vagueness challenge to the underlying statutory authority at issue in this case.

[32] This argument was not advanced by Defendant Carlson.

troubled by the word "human," so the Court need only consider the meaning of the word "consumption."

It is true that the statute does not specifically define "consumption," and in such an instance, the United States Supreme Court has stated that the Court must give the word its "ordinary meaning." Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995). In considering the meaning, the Court employs a "sensibl[e] read[ing]." Jones v. United States, 529 U.S. 848, 855 (2000).

Defendant points out that under Webster's Unabridged Dictionary, there are at least three different meanings of the word, which, Defendant argues, render it ambiguous. (Mem. in Supp. of Mot. to Dismiss at 7). It is true that the word is susceptible to more than one definition: one is in the sense of medical consumption, as in wasting away; another is an economic consumption, as in the using up of goods; and, of course, there is the most ordinary meaning which is to consume, as in to take in. But the mere fact that a word has various definitions does not render it impermissibly vague. See Jones, 529 U.S. at 855 ("Although 'variously defined,' the word 'use,' in legislation as in conversation, ordinarily signifies 'active employment.'").

Defendant asserts that "consumption" as used in the CSA statute must be limited to "analogue substances that are intended to be eaten or drank," which also means that "the Federal Analogue Statute does not apply to analogue substances that are absorbed through the skin (bath salts), absorbed as gas in the air (potpourri) or absorbed through smoke (as in incense burning or smoking)." (Mem. in Supp. of Mot. to Dismiss at 8). The Government argues for a broader reading of the term: "it is readily apparent that the term 'human consumption' refers to drug users' introduction into their bodies of analogue substances by all the same means that drug users ingest controlled substances listed in Schedule I or II of the controlled substances act." (United

States' Omnibus Resp. [Docket No. 202] at 103). The Court agrees that the Government's definition comports with the "ordinary meaning" of the word consumption, as used in the CSA statute.

Defendant's unreasonably narrow and semantic reading of the term "consumption" attempts to introduce ambiguity where none truly exists, and she presents no authority whatsoever supporting her argument. It is common knowledge and hardly needs citation that drugs are capable of intake "by smoking, snorting, inhaling, injecting, eating, and drinking." Lane, 2013 WL 3199841, at *8. Given the purpose of the statute and the context in which the word is used in the statute, the Court finds that the "ordinary meaning" of the word "consumption" plainly means taking in or using. See Black's Law Dictionary 359 (9th ed. 2009) (defining "consumption" as "the use of a thing in a way that exhausts it"); Dyson, Inc. v. Oreck Corp., 647 F. Supp.2d 631, 639 n.2 (E.D. La. 2009) (noting that "to consume" is a definition of "to take" and "to use"). The few courts that have squarely addressed Defendant's argument have unanimously and unequivocally rejected it. See Lane, 2013 WL 3199841, at *8; United States v. McFadden, 3:12CR00009, slip. op. at *8 (W.D. Va. May 10, 2013) (rejecting Defendant's argument because "[s]uch a limited reading would be completely at odds with the purpose of the Analogue Act") (copy available at Docket No. 202, Ex. 10).

### 9. Defendants' argument that the substances alleged in the Superseding Indictment, as a matter of law, are not controlled substance analogues

Defendant Carlson argues that "[t]he substances alleged in the Indictment to be controlled substance analogues are not, as a matter of law, analogues within the meaning of 21 U.S.C. § 802(32)(A)," essentially, because the overriding purpose of the statute was to deal with the new substances that are modified slightly from controlled substances and sold as legal substances. (See Mem. of Points and Authorities [Docket No. 137] at 33-37). Defendant Haugen appears to

join in this argument and argues that "21 U.S.C. § 813 only applies to drugs produced by underground chemists who tinker with the molecules of controlled substances." (Mem. in Supp. of Mot. to Dismiss [Docket No. 165] at 5).

While Defendants are correct that one purpose of the statute was to curb the potential for individuals to make a slight modification to the chemical structure of an already scheduled controlled substance, in an attempt to avoid the reach of the law, and sell it as a legal substance, they provide no authority holding that the Government is limited only to the prosecution of substances created from another substance that has already been scheduled. To the contrary, the Eighth Circuit specifically rejected this argument in <u>Washam</u>. 312 F.3d at 933 ("Congress did not limit the Analogue Statute's application to newly designed drugs. The language of the statute shows that Congress intended to proscribe all drugs that are similar in chemical structure and effect to illegal drugs."). Therefore, the fact that the alleged substances may have been available to the public prior to the scheduling of the substance to which they are analogues in no way puts them beyond the reach of the statute. <u>See Lane</u>, 2013 WL 3199841, at *6 (rejecting the defendants' "cramped reading of the Analogue Act" and holding that "[n]othing in the plain language of the Act suggests that these criteria apply only to new substances developed by altering the chemical composition of a known listed substance").[33]

---

[33] Defendant Carlson also argues that the court in <u>The Smoke Shop, LLC v. United States</u>, No. 12-C-1186 (E.D. Wis. May 21, 2013), (<u>see</u> Docket No. 149, Ex. 1), "determined, as a matter of law, that the chemicals UR-144 and XRL-11 were not analogues of JWH-018, within the meaning of Title 21 U.S.C. Sec. 802(32)(A)." (<u>See</u> Sec. Supp. Aff. of Randall Tigue [Docket No. 149] ¶ 3). First, the decision is not binding on this Court. Second, the <u>Smoke Shop</u> court did not so hold. Rather, upon the defendant's petition for a return of property, and after holding a hearing and hearing testimony from various experts and DEA employees, the court merely stated, in dicta, that "[t]he decision to schedule UR-144 and XLR-11 suggests that they were not analogues in the first instance . . . ." (<u>See</u> Docket No. 149, Ex. 1 at 2-3). The Court made no holding that UR-144 and XLR-11 are not controlled substance analogues as a matter of law.

**10. Defendants' argument that the entrapment by estoppel doctrine bars Defendants' prosecution [Docket Nos. 96, 129, 164, 180]**

"Entrapment by estoppel applies when **an official tells the defendant** that certain conduct is legal and the defendant believes the official." United States v. Austin, 915 F.2d 363, 366 (8th Cir. 1990) (emphasis added) (quoting United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 825 (9th Cir. 1985)). "A defendant has the burden of proving entrapment by estoppel," and he must show that: "(1) an authorized government official, empowered to render the claimed erroneous advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told him the proscribed conduct was permissible, (4) that he relied on the false information, and (5) that his reliance was reasonable." United States v. Batterjee, 361 F.3d 1210, 1216 (9th Cir. 2004) (internal quotation marks and citations omitted).

The plain language from the Eighth Circuit, and the cases in which entrapment by estoppel was found to apply, require that the statement be made directly to the defendant—not merely as a statement to the public at large. See United States v. Ray, 411 F.3d 900, 903 (8th Cir. 2005) (holding that the defendant had to "show that the government assured **him** that certain conduct was legal" (emphasis added)); United States v. Parker, 267 F.3d 839, 844 (8th Cir. 2001) (holding that the defendant could not rely on an entrapment by estoppel defense because he could "point to no evidence illustrating that he reasonably relied upon a law enforcement official's assertion that [his conduct] was legal or that any such assertion was made to **him**" (emphasis added)); United States v. Morris, No. 08-cr-63(2) (JRT/JSM), 2013 WL 3716602, at *4 (D. Minn. Jul. 12, 2013) (finding that the defendant's counsel was not ineffective in failing to pursue an entrapment by estoppel defense because there was no evidence of "any individual who assured **him** that his conduct was legal" (emphasis added)); United States v. Stacy, 696 F. Supp.2d 1141, 1147 (S.D. Cal. 2010) (holding that the entrapment by estoppel defense was not

available because "unlike the cases in which convictions were reversed on the ground of entrapment by estoppel, nobody with authority at any time **personally** told Defendant that his actions were permissible under federal law" (emphasis in original)); United States v. Washington, 887 F. Supp. 2d 1077, 1098 (D. Mont. 2012) ("Defendants cite no case law, and the Court finds none, in which a person justifiably relied on an official's comments to a third party."); United States v. Ramirez-Valencia, 202 F.3d 1106, 1109 (9th Cir. 2000) (holding that the defendant "must show that the government **affirmatively told him** the proscribed conduct was permissible" (emphasis added)); United States v. Neville, 82 F.3d 750, 761 (7th Cir. 1996) ("To employ this defense, we have required that the government official "actively mislead the defendant . . . .").

Therefore, Defendants' list of various statements made by mere public relations personnel or other individuals to the public or parties (as opposed to directly and personally to Defendants), either through news reports, journals, PowerPoint presentations, or in Congressional testimony, fails to demonstrate an essential element of entrapment by estoppel: that statements were made to him rather than in a general sense to the public at large. (See Mem. of Points and Authorities [Docket No. 137] at 37-45); (Mem. in Supp. of Mot. [Docket No. 165] at 1-11). Defendants' mere listing and mention of numerous "statements," without any analysis on why such statements meet the elements of entrapment by estoppel, suffers from a host of other problems that make the application of entrapment of estoppel inapplicable in this case. For instance, many of the "statements" make no representation regarding the legality of any substances at issue in the first place. Furthermore, contrary to Defendants' misleading characterization of news reports that an "authorized" government official made a statement

supporting estoppel,[34] the source articles fail to provide any direct statements made to Defendants personally by an authorized government official that any of the substances at issue were legal. See Washington, 887 F. Supp. 2d at 1095 (holding that "[t]he Defendants cannot claim to have reasonably relied on any statements made by journalists or authors of press releases . . . [, n]or are newspapers' interpretations of official statements entitled to deference; an official may be misquoted, quoted out of context, or misinterpreted"). Indeed, many of the "statements" to which Defendants point were made by individuals who appear to be private actors without any actual, demonstrated government authority. Nor have Defendants demonstrated that the individuals making the statements were "made aware of all the relevant historical facts" or that Defendants themselves were aware of the statements made by these individuals prior to this action. See Stacy, 696 F. Supp.2d at 1147 (holding the defense not available because the "Defendant [did] not state that he personally read or heard these statements prior to engaging in the conduct that form[ed] the basis of [the] criminal case").

There is no basis to conclude that entrapment by estoppel applies in this case, and the Court finds that Defendants' motions to dismiss on this basis should be **DENIED**. See Lane, 2013 WL 3199841, at *9 (rejecting the defendant's alleged reliance on general "statements made by Senators and judges regarding the Analogue Act" and denying the defendant's motion to

---

[34] Defendants' reliance on a news interview statement from a DEA media spokesperson that Defendant Carlson was "[u]nfortunately . . . correct," (see Docket No. 107, Ex. 29) fares no better than any of the other statements which appear to have no direct involvement with any of the Defendants in this case. Even if the statement from the DEA spokesperson could be considered an authoritative statement by a government official, and even if it were considered to have been made personally to Defendant Carlson—although it plainly appears to have been made to the author of the news article—it provides no statement that the specific substances Defendants are charged with in this Indictment were legal to sell; taken into context, the DEA spokesperson merely stated, at most, that Defendant was correct that the DEA, at that time, had only scheduled five substances or that other substances were "readily available." (See Docket No. 107, Ex. 29). To the extent that Defendants argue that the DEA spokesperson had some kind of affirmative duty to more clearly prevent any subjective confusion on Defendants' behalf, they have entirely failed to provide authority for such a proposition that a government official must remedy an individual's subjective misunderstanding of the law.

dismiss the indictment on the basis of entrapment by estoppel because "he fail[d] to address the elements of entrapment by estoppel").

>    **11. Defendants Gellerman and Haugen's argument that Count 21 should be dismissed because they cannot be held responsible for the conduct of their customers [Docket Nos. 166 and 181].**

Defendants Haugen and Gellerman argue that they are "not vicariously liable for the illegal conduct of Defendants' customers, who are not listed as coconspirators in the indictment." (Mem. in Supp. of Mot. to Dismiss [Docket No. 167] at 3).

This argument is unpersuasive. Contrary to Defendants' assertions, Defendants are not being prosecuted for any of the actions of their customers. Rather, at trial, the Government will be required to prove all of the elements of §§ 813 and 802(32)(A)—none of which require a showing that the customers actually ingested the substances, which is also the likely reason that, as Defendant Haugen notes, "[t]here [are] no allegation[s] in the [I]ndictment that any of the Defendants consumed their products as drugs." (Id.) While the statute requires that the substance should have been "intended for human consumption," nothing in the law actually requires human consumption. More to the point, the Government's case will turn, in part, on its ability to prove Defendants' own intent that their sale or distribution of the substance at issue was for human consumption.

Thus, contrary to Defendants' argument that "[i]t is obvious from the face of the indictment that the labeling crimes alleged in the indictment only occurred when Defendants' customer chose to smoke or ingest Defendants' products, instead of suing them according to their liable," Count 21, which is the only Count Defendants Haugen and Gellerman seek to dismiss by this argument, does not require any actual consumption on the part of the customer. Therefore, there is no basis whatsoever to argue that either Defendant Haugen, or Defendant

Gellerman, is being prosecuted vicariously for any alleged crimes committed by the consumers of the substances at issue in Count 21.  These motions to dismiss should be **DENIED**.

### 12. Defendants' Motions to Dismiss as a "Thought Crime" [Docket No. 96, 124]

Defendant Carlson argues that Counts 19 and 20 against him must be dismissed, and Defendant Gellerman argues that Count 21 against him must be dismissed, because the SDAPA has created a "thought crime" in violation of the First Amendment to the United States Constitution.  (See Docket Nos. 96, 124).  In particular, Defendants argue that the SDAPA, by criminalizing substances that stimulate the cannabinoid receptors in the brain and central nervous system, creates a "thought crime" that is unconstitutional as a violation of the First Amendment.  "By targeting chemicals that bind with certain receptors, chemicals that cause an alteration in the communicativeness of the body's neurons, Congress has effectively created a thought crime in violation of the First Amendment to the United States Constitution."  (Def. Carlson's Mem. Supp. Mot. Dismiss [Docket No. 137] at 26).[35]

This argument is a *non sequitur* as regards Defendant Carlson, because Counts 19 and 20 do not charge him with violating the "cannabimimetic agent" section of the SDAPA, but instead charge him with distribution and with possession with intent to distribute AM2201, which is specifically scheduled as a Schedule I substance.  (See Superseding Indictment ¶¶ 36-39).  Thus, even if this Court was to find the "cannabimimetic agent" section of the SDAPA to be unconstitutional, which it is not, such a finding would not warrant dismissal of Counts 19 and 20 against Defendant Carlson.  The argument also fails as regards Defendant Gellerman, because Count 21 does not charge Defendant Gellerman with a violation of the SDAPA, but instead charges him with conspiracy to distribute controlled substances analogues.  (See Superseding

---

[35] This description by Defendants of a "thought crime" in violation of the First Amendment is frivolous on its face.  There is nothing in Counts 19-21 of the Superseding Indictment which in even the remotest way could be seen as an attempt to criminalize the content of Defendants' speech.

Indictment ¶¶ 40-42).  Thus, even if this Court was to find the "cannabimimetic agent" section of

the SDAPA to be unconstitutional, which it is not, such a finding would not warrant dismissal of

Count 21 against Defendant Gellerman.

The Court therefore recommends that Defendants Carlson's and Gellerman's motions to

dismiss Counts 19-21, (Docket Nos. 96, 124), to the extent that they argue that the SDAPA

unconstitutionally criminalizes a "thought crime," be **DENIED**.

### 13. Defendants' Motions to Dismiss for Insufficiency of the Indictment [Docket Nos. 152, 169, 174]

Defendants argue that the Superseding Indictment must be dismissed as insufficient

because, although it identifies the alleged controlled substance analogues that Defendants are

charged with conspiring to distribute, it does not specify the controlled substance or substances

for which the charged substances are alleged to be analogues.  (See Docket Nos. 152, 169, 174).

As this Court noted in its Orders of July 3, 2013, "[a]lthough the Defendants filed some

fifty-two (52) pages of memoranda in support of their motions [to dismiss for insufficiency of

the indictment, or in the alternative for a bill of particulars], they fail to cite a single case in

which the Government was required to list in the indictment or in a bill of particulars the specific

controlled substance that an alleged analogue was alleged to be an analogue of."  (See, e.g.,

Order [Docket No. 211] at 11).  "In order to show an Analogue Act violation, the Government

must prove (1) substantial chemical similarity between the alleged analogue and a controlled

substance; (2) actual, intended, or claimed physiological similarity (in other words, that the

alleged analogue has effects similar to those of a controlled substance or that the defendant

intended or represented that the substance would have such effects; and (3) intent that the

substance be consumed by humans."  Klecker, 348 F.3d at 71 (citations omitted, emphasis in

original).  There is no requirement that the indictment itself, as opposed to some evidence

provided in discovery,[36] identify the controlled substance for which an alleged analogue is analogous. Accordingly, those federal courts that have considered this argument have rejected it. See, e.g., Newbold v. United States, 2009 WL 2243642, at *11 (M.D. N.C. Jul. 27, 2009) (indictment that did not specify substance to which analogue was analogous "clearly was not defective").

Thus, the Court recommends that Defendants' motions to dismiss for alleged insufficiencies in the indictment, (Docket Nos. 152, 169, 174), be **DENIED**.

### C. Motion to Dismiss Counts 31-55 of the Superseding Indictment[37] [Docket No. 96]

Counts 31-55 of the Superseding Indictment all allege various monetary transactions in property allegedly derived from specified unlawful activity. (See Superseding Indictment ¶¶ 46-49).

Defendant Carlson argues only that all of these counts are "premised upon the [D]efendant having engaged in financial transactions in violation of the [Controlled Substances Act]," and because, according to Defendant, "all of the [Controlled Substances Act] counts are legally meritless and should be dismissed," Counts 31-55 must also be dismissed. (Mem. of Points and Authorities [Docket No. 137] at 45). The Defendant is incorrect in his underlying assumption on which this argument is based.

Having found that all other counts in the Superseding Indictment should remain, the Court finds that Defendant Carlson's argument fails and that his motion to dismiss Counts 31-55 of the Superseding Indictment should be **DENIED**.

---

[36] In the present case, "the Government on June 10, 2013, provided Defendants with the declarations of two Drug Enforcement Administration scientists, chemist Terrence Boos and pharmacologist Jordan Trecki, who specify the controlled substance for which each of the alleged analogues is alleged to be an analogue." (Order [Docket No. 211] at 12 (citations to the record omitted)).

[37] The Court notes that the motion filed by Defendant Carlson challenging Counts 31-55 was filed prior to the filing of the Superseding Indictment. (See Docket No. 96). However, because Counts 30-54 of the original Indictment are essentially the same as Counts 31-55 of the Superseding Indictment, the Court construes all of the motions to dismiss these counts as motions to dismiss the counts in the Superseding Indictment.

## II. DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE [DOCKET NOS. 95, 106, 120]

Defendants challenge the sufficiency of search warrants executed in the present case, and the seizure of evidence pursuant to those warrants. (See Docket Nos. 95, 106, 120). A total of six (6) search warrants were executed:

1. A federal search warrant for the premises of the Last Place on Earth, executed on July 25, 2012 (the "Federal Search Warrant"), which was offered by the Government and accepted by the Court as Government's Exhibit No. 1;

2. A federal seizure warrant executed on July 25, 2012;

3. A federal search warrant for search of an America Online account or accounts on February 17, 2012;

4. A federal search warrant for search of a Facebook account or accounts on February 17, 2012;

5. A state search warrant, executed on November 18, 2011, for the search of electronic media seized pursuant to a prior state search warrant; and

6. A state search warrant for the premises of the Last Place on Earth, and for the person of Defendant Carlson, executed on September 21, 2011 (the "State search warrant"), which was offered by the Government and accepted by the Court as Government's Exhibit No. 6.

Defendants specifically challenge the search warrants accepted by the Court as Government's Exhibits Nos. 1 and 6; they challenge the other four (4) warrants only to the extent that they are derivative of the warrants accepted by the Court as Government's Exhibits Nos. 1

and 6.[38]  Thus, the Court reviews Government's Exhibits Nos. 1 and 6, and their accompanying affidavits, on the four corners of the documents.

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV. The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause."  United States v. Parker, 836 F.2d 1080, 1083 (8th Cir. 1987).  Probable cause exists when "a practical, common-sense" evaluation of "all the circumstances set forth in the affidavit" demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Gates, 462 U.S. at 231).  "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Murphy, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, Gates, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach."  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted).  "Therefore, '[w]hen the [issuing judge] relied solely upon the

---

[38] Defendant Gellerman's motion, [Docket No. 120], appears to seek suppression of a "physical evidence seized from the Defendant [Gellerman], his home, his automobile or his belongings."  (Id. at 1).  However, at the June 20, 2013, motions hearing Defendant Gellerman never identified any such search or any such evidence, and instead adopted the arguments of his co-Defendants relative to the searches described above.  Consequently, the Court considers Defendant Gellerman's motion and his arguments to be the same as those brought by his co-Defendants.

supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting Solomon, 432 F.3d at 827) (alterations in original).  "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)).  Nevertheless, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)).  "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." Gates, 462 U.S. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### B.  Facts

#### 1.  The State search warrant[39]

The State search warrant was signed by Minnesota District Court Judge Heather L. Sweetland on September 21, 2011, pursuant to the application and affidavit of Duluth Police Sergeant Andrew Mickus (Sgt. Mickus).  (See Gov't's Ex. 6).

In June 2011, in advance of a then-new Minnesota state law criminalizing the possession and/or distribution of synthetic cannabinoids, members of the Lake Superior Drug & Gang Task Force (the "Task Force") visited the Last Place on Earth and provided the business with a copy of the pending new law.  (Id. at 2369, ¶¶ 3-4).  Subsequently, on August 10, 2011, two members of the Task Force, Duluth Police Investigator Tanski (Investigator Tanski) and Hermantown

---

[39] The factual record is derived from the Government's application for a search warrant, and from the affidavit attached thereto, signed on September 21, 2011, by Duluth Police Sergeant Andrew Mickus, all of which was submitted by the Government, and admitted by the Court, as Government's Exhibit 6.  Page numbers in citation refer to the Bates numbers affixed in the bottom right-hand corner of each page of Exhibit 6, each beginning with SSW_0000.

Police Investigator Easterbrooks (Investigator Easterbooks),[40] were informed by Duluth Police officers of increasing complaints about Last Place on Earth and its clientele, including complaints that Last Place on Earth was selling synthetic marijuana in unmarked baggies and referred to as "special blend" and "no name." (Id. at 2369, ¶ 5). Pursuant to those complaints, Investigator Easterbooks outfitted himself with an electronic recording device and visited Last Place on Earth, where he observed customers purchasing a leafy product referred to as "no name" and delivered in a see-through plastic bag. (Id. at 2369, ¶ 6). Sales of this and other products that Investigator Easterbrooks believed to be synthetic marijuana were recorded by the store clerk in a notebook. (Id. at 2370, ¶ 6). Investigator Easterbrooks asked the clerk for a 3-gram bag of "no name," and asked what else the clerk recommended, upon which the clerk pointed to a product named "Maya Blue" and indicated that it was "one of the strongest ones." (Id.). Investigator Easterbrooks proceeded to purchase bags of "no name" and "Maya Blue," which were entered into evidence and submitted for testing to the Minnesota Bureau of Criminal Apprehension ("MBCA"). (Id.). On September 13, 2011, those test results were returned, reporting that the "no name" contained a substance known as AM-2201, and that the "Maya Blue" contained substances known as JWH-018, JWH-073, and JWH-250, which were criminalized in Minnesota effective as of July 1, 2011, under Minn. Stat. 152.02. (Id. at 2370, ¶ 7).

On September 8, 2011, Investigator Easterbrooks, again outfitted with an electronic monitoring device, returned to Last Place on Earth, where he purchased a bag of "no name" and a bag of "Fear and Loathing #2." (Id. at 2370, ¶ 8). Again, the clerk recorded the sales in a notebook. (Id.) Upon leaving the store, Investigator Easterbrooks entered the bags and their contents into evidence. Investigator Easterbrooks returned again the following day, September 9,

---

[40] The affidavit identifies Investigator Tanski and Investigator Easterbrooks only by their last names.

2011, and purchased baggies of "no name," "Fear and Loathing One," and "Oblivion." (Id. at 2371, ¶ 9). Again, the clerk recorded the sales in a notebook. (Id.). During the transaction, Investigator Easterbooks stated that he needed to provide urine samples, and the clerk told him that the substances he had purchased were not illegal and would not show up in urine testing. (Id.). Upon leaving the store, Investigator Easterbrooks entered the bags and their contents into evidence, and Investigator Tanski submitted the substances purchased on September 8 and 9, 2011, to the MBCA for testing. (Id.). Each of those five substances was found by the MBCA to contain AM-2201, which the MBCA said was "considered a cannabinoid receptor agonist and therefore a synthetic cannabinoid." (Id. at 2371, ¶ 10).[41]

On September 16, 2011, Investigator Easterbrooks and Sgt. Mickus visited Last Place on Earth, where Investigator Mickus purchased bags of "no name," "Maya Blue Crystal Skull," and "Smokin Camel Potpourri Kush." (Id.). Upon leaving the store, the bags and their contents were entered into evidence, and the substances were submitted to the MBCA for testing. (Id.)

On September 21, 2011, Investigator Easterbrooks returned to Last Place on Earth outfitted with an electronic monitoring device and a concealed video recording device. (Id. at 2375, ¶ 32). There, he purchased a bag of "Maya Blue Crystal Skull," which was identical in its packaging to the previously purchased bags of "Maya Blue," one of which contained substances that were expressly criminalized under Minn. Stat. 152.02. (Id.).

Drawing on his law enforcement experience, Sgt. Mickus described the types of evidence that might be seized from an illegal drug operation, such as cash, financial records, notebooks,

---

[41] The Court takes judicial notice that the version of Minn. Stat. 152.02 that was in effect in August and September 2011 provided that "[a] person who unlawfully sells any amount of a synthetic cannabinoid is guilty of a gross misdemeanor," and that "[a] person who unlawfully possesses any amount of a synthetic cannabinoid is guilty of a misdemeanor." See 2011 Minn. ALS 53, Minn. Chapter Law 53 (Lexis May 24, 2011). Although AM-2201 was subsequently added and specifically listed as a synthetic cannabinoid, see 2012 Minn. ALS 240, Minn. Chapter Law 240 (Lexis Apr. 27, 2012), it was not specifically listed at the times described in the State Search Warrant.

mobile phones, computers and computer components, and further described that such evidence

often is found at the place of business and/or in a nearby storage space.  (Id. at 2372-74, ¶¶ 16-

31).

Sgt. Mickus swore out his affidavit before Hon. Heather L. Sweetland, Minnesota State

District Judge, on September 11, 2011, at 12:12 p.m..  (Id. at 2376).  Judge Sweetland signed the

search warrant on the same day, September 11, 2011, and at the same time, 12:12 p.m.,

authorizing such search and seizure between the hours of 7:00 a.m. and 8:00 p.m.  (Id. at 2365-

66).  In particular, the State search warrant authorizes a search for and seizure of:

> Controlled substances to include but not limited to synthetic cannabinoids.  This
> will include "Armageddon" incense products to include but not limited to "Maya
> Blue," "Fear and Loating [sic] #1," "Fear and Loathing #2" and any other
> products that are similarly packaged, advertised, sold or are consistent in
> appearance to synthetic marijuana.

(Id. at 2365) (also authorizing search for and seizure of business records related to such

products).

## 2. The Federal search warrant[42]

The Federal search warrant was signed by U.S. Magistrate Judge Steven E. Rau on July

24, 2012, pursuant to the application and affidavit of Sgt. Mickus.  (See Gov't's Ex. 1).  The

affidavit of Sgt. Mickus substantially recounts the facts presented in his affidavit for the State

search warrant, and reports on the execution of the State search warrant.  (See generally Id.).

Additionally, the affidavit alleges the following:

After executing the State search warrant, sent thirty-nine (39) samples of the materials

seized to the MBCA.  (Id. at 29, ¶ 60).  Of those, twenty-eight (28) were determined to contain

---

[42] The factual record is derived from the Government's application for a search warrant, and from the affidavit
attached thereto, signed on July 24, 2012, by Duluth Police Sergeant Andrew Mickus, all of which was submitted by
the Government, and admitted by the Court, as Government's Exhibit 1.  Page numbers in citation refer to the
affixed Bates in the bottom right-hand corner of each page of Exhibit 1, each beginning with FSW_000000.

the substance AM-2201.  (Id.).  Of those twenty-eight (28) samples determined to contain AM-2201, thirteen (13) were branded as "no name," and fifteen (15) were branded with different names.  (Id. at 29, ¶ 61).[43]  Of the remaining eleven samples, MBCA identified three (3) that were marked as "Exotic Skin Treatments" containing the alleged controlled substance analogue 5-MeO-DALT, seven (7) were determined to contain an herb known as Kratom, and one (1) was determined not to contain any noteworthy substances.  (Id. at 30, ¶¶ 62-64).

On September 23, 2011, a mere two (2) days after the State search warrant was executed, Duluth Police Department Investigator Greene ("Investigator Greene"),[44] outfitted with video and audio recording devices, entered Last Place on Earth and purchased three (3) grams of "no name," a sample of which was sent to the MBCA for analysis.  (Id. at 30-31, ¶¶ 65-66).  The MBCA reported that the sample contained the substances AM-2201 and JWH-250, the latter of which was specifically listed as a controlled substance under Minnesota law, and was considered to be an analogue of the federally controlled substance JHW-018 and, therefore, illegal under the Federal Controlled Substances Act.  (Id. at 31,  ¶¶ 66-67).

On October 25, 2011, Investigator Greene again donned an electronic monitoring device, entered Last Place on Earth, and purchased two (2) grams of "Camel" and one (1) package of "Fear and Loathing," samples of which were sent to the MBCA for testing.  (Id. at 31, ¶¶ 68-69).  MBCA reported that both products contained AM-2201.  (Id. at 31, ¶ 69).  Subsequent undercover purchases on February 7, 2012, of a product called "Red Bull," and on April 24, 2012, of a product called "10xxSuper Smoking Dragon Potpourri," were also tested at by the MBCA, and were also found to contain AM-2201.  (Id. at 31-32, ¶¶ 70-73).  Finally, on or about

---

[43] Those brand names included "Smokin Camel –KUSH," "Smokin Camel – Blueberry," "Smokin Camel – Hypnotiq," "Smokin Camel – Strawberry," "Smokin Camel – Cotton Candy," "Smokin Camel – Grape," "FTW/BTL," "Oblivion," "LPOE," "Sk8er," "Fear & Loathing II," "Fear & Loathing," "Maya Blue Crystal Skull," "DOA," and "Magic Silver."  (Id.).
[44] The affidavit identifies Investigator Greene only by last name.

June 14, 2012, DEA undercover officers purchased several quantities of "no name," two of which DEA analysts found contained a substance called UR-144. (Id. at 32-33, ¶ 75). The affidavit identifies the substances AM-2201, 5-MeO-DALT, and UR-144 as controlled substance analogues. (Id. at 23-27, ¶¶ 76-87 and accompanying illustrations).

The affidavit further alleges that the alleged controlled substances and controlled substance analogues moved in interstate commerce, (Id. at 28-31, ¶¶ 89-98); that they would qualify as "drugs" under the Food and Drug Administration Act and were intended for human consumption, (Id. at 31-34; ¶¶ 99-113); and that they were misbranded and misleading, (Id. at 34-35; ¶¶ 114-116).[45]

Finally, based on his law enforcement experience and his experience with the present case, Sgt. Mickus details the various items to be searched and seized. (Id. at 35-43; ¶¶ 117-126). Those items include computers and their components, currency and other precious metals derived from trafficking activities, ledgers and other records of operations, firearms and other weapons, electronic communication devices such as mobile phones and pagers, and various other items. (Id.).

Sgt. Mickus swore out his application and affidavit before Hon. Steven E. Rau, U.S. Magistrate Judge, on July 24, 2012, at 11:45 a.m. (Id. at 5, 43). Judge Rau signed the search warrant on the same day, July 24, 2012, and at the same time, 11:45 a.m., authorizing such search and seizure between the hours of 6:00 a.m. and 10:00 p.m., on or before August 8, 2012. (Id. at 5).[46]

---

[45] Because Defendants challenges to the Federal search warrant do not specifically address these allegations, the Court need not recount them in detail.

[46] The Government represented at the June 20, 2013, motions hearing that Government's Exhibit 1 contained only the *search* warrant, and that the *seizure* warrant was provided in another document. Because Defendants did not seek a four-corners review of that seizure warrant, it was not offered to the Court, and we do not consider it in this Report and Recommendation.

### C. There Was Probable Cause for both the State Search Warrant and the Federal Search Warrant.

Defendants argue that evidence seized pursuant to the State search warrant should be suppressed because (1) the warrants were "general warrants"; (2) the supporting affidavits failed to articulate probable cause or, in the alternative, that they did so by misrepresenting the facts; and (3) that the scope of the seizure exceeded what was authorized by the warrant. (See, e.g., Docket No. 95).

#### 1. The search warrants described the items to be searched and seized with sufficient particularity and, therefore, were not a "general warrant."[47]

"The language of a search warrant must describe the items to be seized with sufficient particularity: 'the language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things to be seized.'" United States v. Lowe, 50 F.3d 604, 607 (8th Cir. 1995) (quoting United States v. Saunders, 957 F.2d 1488, 1491 (8th Cir. 1992)). "The standard is one of 'practical accuracy,' recognizing that the specificity required hinges on the circumstances of each case." Id. (citing United States v. Strand, 761 F.2d 449, 453 (8th Cir. 1985)).

Neither the State nor the Federal search warrants in the present case were "general warrants." General warrants have been described as "warrants not grounded upon a sworn oath of a specific infraction by a particular individual, and thus not limited in scope and application." Maryland v. King, --- U.S. ---, 133 S. Ct. 1958, 1980 (2013) (Scalia, J., dissenting). Both the State search warrant and the Federal search warrant are grounded upon the sworn oath of Sgt. Mickus, and both describe by name, and in some cases by general appearance, several specific products to be seized. Additionally, in his affidavit Sgt. Mickus describes the test results that

---

[47] Because Defendants did not specifically challenge the Federal *seizure* warrant, the analysis here with regard to the Federal search warrant concerns only whether there was probable cause for a search. See fn.46, supra.

identify those products and the allegedly illegal substances they contain, some of which were specifically identified as containing substances that were criminalized under Minnesota law and/or Federal law, and some of which were alleged to be illegal analogues of such substances. Consequently, the Court cannot conclude that either the State or Federal search warrants were a "general warrant."

        **2.    The search warrants sufficiently allege probable cause, and do not misrepresent material facts in order to do so.**

   "An affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." Parker, 836 F.2d at 1083. In his affidavit in application for the State search warrant, Sgt. Mickus describes his purchase of a product called "Maya Blue," which upon subsequent testing was found to contain multiple substances that were expressly criminalized in Minn. Stat. § 152.02. Sgt. Mickus further describes purchasing the same product again only five (5) days after Judge Sweetland signed, and law enforcement executed, the State search warrant. Similarly, with regard to the Federal search warrant, Sgt. Mickus again identifies specific products, reports that the testing of those products identified them as containing either specific controlled substances and/or controlled substance analogues, and for those alleged to be controlled substance analogues he reports why those substances were believed to be controlled substances analogues. Thus, each affidavit alleges the repeated sale of a particular product or products alleged to contain particular allegedly illegal substances. The Court concludes that a reasonable person presented with such an affidavit would find at least a fair probability that a search of such a defendant and/or of the premises of such sales would result in the seizure of said allegedly illegal substances.

    A court issuing a search warrant upon a determination of probable cause must be afforded "'great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli, 393 U.S. at

419).  "[T]he duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . [concluding]' that probable cause existed."  Id. at 238-39 (quoting Jones, 362 U.S. at 271).  Both Judge Sweetland and U.S. Magistrate Judge Rau had substantial bases for concluding that there was probable cause for the searches they authorized by the separate warrants they signed.

Defendants' argument in the alternative is a Franks challenge.  The Court in Franks v. Delaware, 438 U.S. 154 (1978) "held that a facially sufficient affidavit may be challenged on the ground that it used deliberately or recklessly false statements to demonstrate probable cause." United States v. Smith, 581 F.3d 692, 695 (8th Cir. 2009).  The Eighth Circuit has "extended this rule 'to allow challenges to affidavits based on alleged deliberate omissions.'"  Id. (quoting United States v. Reivich, 793 F.2d 957, 960 (8th Cir. 1986)).  "[R]ecklessness may be inferred from the fact of omission of information from an affidavit . . . only when the material omitted would have been 'clearly critical' to the finding of probable cause."  United States v. Thompson, 690 F.3d 977, 987 (8th Cir. 2012) (quoting United States v. Ozar, 50 F.3d 1440, 1445 (8th Cir. 1995) (quoting, in turn, Reivich, 793 F.2d at 961)).  "[T]he test 'is whether, after viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  United States v. McIntyre, 646 F.3d 1107, 1114 (8th Cir. 2011) (quoting United States v. Butler, 594 F.3d 955, 961 (8th Cir. 2010)).

Defendants identify four alleged omissions that they argue constitute recklessness, such that their omission would have been clearly critical to the finding of probable cause:

1. That there is no scientific consensus concerning the phrase "substantially similar structure" as it pertains to controlled substance analogues, a "fact" that Defendants

allege even the chief chemist for the Drug Enforcement Administration (DEA) has acknowledged;[48]

2. That the alleged analogues were not new drugs, but instead were patented before their alleged underlying substance, JWH-018, was listed as a controlled substance;[49]

3. That Defendants were not provided personalized specific notice by the DEA that it had temporarily scheduled five (5) substances, including JWH-018, as controlled substances on March 1, 2011; and

4. That DEA officials and members of Congress had stated that only those five (5) substances, and no other substances (or, presumably, analogues) were made illegal.[50]

(See Def. Carlson's Mem. Supp. Mot. Suppress Evid. [Docket No. 141] at 2).[51]

None of the foregoing arguments is availing. First, Defendants fail to demonstrate that Sgt. Mickus *knew* these alleged "facts" and knowingly and recklessly omitted them from his affidavits. See McIntyre, 646 F.3d at 1114 (where "there is no evidence to support a finding that [the investigators] had reason to believe or know" the erroneous information, "the alleged falsehoods do not meet the substantial preliminary showing required by Franks" (internal quotations and citation omitted)). Thus, Defendants have "failed to show that the investigator[] 'had obvious reasons to doubt the accuracy of the information'" provided in his affidavits. Id. (quoting Butler, 594 F.3d at 961). Additionally, even if the Court was to accept any or all of

---

[48] Here, the Court considers this alleged fact only for purposes of Defendants' motions to suppress evidence; Defendants' arguments to dismiss on the basis of vagueness are addressed in Part I.B.8, supra.
[49] Here, the Court considers this alleged fact only for purposes of Defendants' motions to suppress evidence; Defendants' arguments to dismiss on the basis of vagueness are addressed in Part I.B.8, supra.
[50] Here, the Court considers this alleged fact only for purposes of Defendants' motions to suppress evidence; Defendants' arguments to dismiss on the basis of entrapment by estoppel are addressed in Part I.B.10, supra.
[51] Defendants do not specify which argument applies to which search warrant. Thus, the Court considers each argument as against each search warrant.

these alleged "facts" as both true[52] *and* known to Sgt. Mickus, Defendants provide no authority for the proposition that such fact(s) would be sufficient to warrant suppression of evidence. Defendants' arguments fail to demonstrate their need for a <u>Franks</u> hearing, much less that the evidence obtained as a result of the State search warrant should be suppressed.

Finally, during the June 20, 2013, motions hearing, Defendants made one additional argument: that Sgt. Mickus had no basis for his purported knowledge that AM-2201 "is considered a cannabinoid receptor agonist."  However, Defendants mischaracterize Sgt. Mickus's statement.  In fact, he stated that the analysts at the MBCA had reported that AM-2201 is considered a cannabinoid receptor agonist, and his statement was based on the report received from the MBCA on September 21, 2011.  (<u>See</u> Gov't's Ex. 6, at 2371, ¶ 10).  Thus, the Court finds that Sgt. Mickus sufficiently provided a reasonable basis for this knowledge.

### 3. The seizures pursuant to the State search warrant did not exceed the scope of the warrant.[53]

In their written memoranda, Defendants do not specifically articulate what items seized were beyond the scope of the State search warrant.  (<u>See</u> Def. Carlson Mem. Supp. Mot. Suppress Evid. [Docket No. 141]).  At the June 20, 2013, motions hearing, Defendants advanced a single argument in this regard: that pursuant to the State search warrant, law enforcement seized money from Last Place on Earth, but did so without any way of distinguishing between money obtained by way of allegedly illegal transactions and money obtained by way of perfectly legitimate transactions.

---

[52] These assertions are indeed not "facts."  These assertions are merely restatements of other legal arguments challenging the Superseding Indictment, which the Court has already addressed and rejected above.

[53] Again, the Court notes that although Defendants challenged the Federal *search* warrant, they did not ask the Court to review the Federal *seizure* warrant.  <u>See</u> fn.46, <u>supra</u>.  Consequently, the Court considers Defendants' argument with regard to the scope of the seizure of evidence as against only the State search warrant.

Here, again, Defendants' argument is unavailing.  The State search warrant provides for the seizure of "United States currency, which may be proceeds from sales of controlled substances and recorded government funds, and other valuables purchased with the fruits and proceeds of controlled substance transactions . . . ."  (Gov't's Ex. 6, at 2365).  However, courts have recognized that the particular nature of cash is such that, where licit and illicit monies are commingled, it may be impractical for a court to try to set out to distinguish between the two in a search warrant.

For example, in United States v. Conley, 859 F. Supp. 899 (W.D. Pa. 1994), the court was faced with a similar objection.  A search warrant was served on the defendant's home, and provided for the seizure of, among other items, "[a]ny and all monies realized from the operation of the video poker machines and any and all containers for said coins and currency."  Id. at 901.  The defendant sought to suppress evidence of coins and currency seized from her home, arguing that "the warrant failed to limit the discretion of the officers by failing to inform the officers how to distinguish 'monies realized from the operation of video poker machines' from other monies."  Id. at 908.  The court rejected this argument, writing:

> "The use of generic classifications in a warrant is acceptable when a more precise description is not feasible."  Here, the Magistrate Judge authorized the seizure of money, which by its very nature and function is fungible.  The Magistrate Judge limited the seizure as well as could be done under the circumstances, and [defendant] has suggested no better alternative limitation.  To require more particularity under these circumstances would raise the Government's burden beyond the level of probable cause to search and seize.

Id. (quoting United States v. Christine, 687 F.2d 749, 760 (3d Cir. 1982).[54]  Conley is directly analogous to the present case.

---

[54] United States v. Davis, 226 F.3d 346, 357 (5th Cir. 2000) ("Obviously, when tainted money is mingled with untainted money in a bank account, there is no longer any way to distinguish the tainted from the untainted because money is fungible.") (citing United States v. Ward, 197 F.3d 1076, 1083 (11th Cir. 1999); United States v. Moore, 27 F.3d 969, 976-77 (4th Cir. 1994)); United States v. Gianelli, 585 F. Supp. 2d 150, 167-68 (D. Mass. 2008)

In both cases, the warrant specifically provided for the seizure of monies related to alleged illegal activity. In both cases, the Defendants acknowledged that any such monies were commingled with monies derived from activities not implicated by the indictment. And in both cases, although Defendants criticized the Government's seizure of the commingled monies, they offered no better way of distinguishing those monies implicated by the indictment and those not implicated by the indictment. In essence, Defendants ask the Court to suppress potential evidence of their allegedly illegal activities because *they commingled those alleged illicit monies with other licit monies*. Because Defendants fail to cite any authority that would support this part of their motion to suppress, the Court agrees with the analysis in Conley and concludes that the seizures did not exceed the scope of the State search warrant.

### 4. The good-faith rule.

Additionally, even if the Court were to conclude that there was not probable cause to support the search warrants at issue, the executing officers' good-faith reliance on that warrant would militate against suppressing evidence obtained in the search. See United States v. Leon, 468 U.S. 897, 919-21 (1984) (exclusionary rule does not apply "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope").[55] Defendants have not alleged, either in their written arguments or at the June 20, 2013, motions hearing, that any of the Leon exceptions to the good-faith rule[56] are applicable here.

---

("[T]he fungible nature of money makes the seizure of a wide-range of financial records appropriate. Money made in illegal activities can easily be commingled with money made from legal activities and, therefore, tracing ill-gotten money requires access to all kinds of financial information and documentation."); United States v. Martin, 460 F. Supp. 2d 669, 677 (D. Md. 2006) ("Given the fungible and readily transferable nature of the property (mostly cash) and the size and seriousness of the alleged conspiracy (which includes large sums of money exchanged among dozens of defendants in multiple jurisdictions), this Court cannot conclude that there was no probable cause to believe that a seizure warrant was necessary to secure the property for trial.").

[55] See also United States v. Johnson, 219 F.3d 790, 791 (8th Cir. 2000) ("Even if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed."); United States v. Rugh, 968 F.2d 750, 753 (8th Cir. 1992) ("When police objectively and reasonably believe that probable cause exists to

Based on the information provided in the affidavits, and applying a common-sense approach, and considering the totality of the circumstances, the Court concludes that there is ample evidence to conclude that probable cause existed for the issuance of the State and Federal search warrants. The Court recommends that Defendants' motions to suppress evidence (Docket Nos. 95, 106, 120) be **DENIED**.

## III. DEFENDANT HAUGEN'S MOTION TO SUPPRESS STATEMENTS [DOCKET NO. 94]

Defendant Haugen seeks to suppress statements she made to law enforcement during an interview with law enforcement at the Last Place on Earth store in Duluth, Minnesota on July 25, 2012. (See Mot. to Suppress [Docket No. 94] at 1). She argues that any statements she provided to law enforcement were obtained in violation of her Fifth Amendment rights because she was never provided with a Miranda[57] warning. (Id.)

### A. Facts[58]

On the morning of July 25, 2012, Special Agent Steven Lomicka (SA Lomicka), along with other law enforcement officers, executed a search warrant at the Last Place on Earth store (Store) in Duluth, Minnesota. At approximately 1:15 p.m., several hours into the execution of the search warrant, an individual approached SA Lomicka and advised him that Defendant

---

conduct a search based on an issuing judge's determination of probable cause, evidence seized pursuant to the ultimately invalid search warrant need not be suppressed.").

[56] See Leon, 468 U.S. at 923 (exceptions to the good faith rule when issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," "where the issuing magistrate wholly abandoned his judicial role," or when the warrant is "so facially deficient -- i.e., in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonable presume it to be valid").

[57] Miranda v. Arizona, 384 U.S. 436 (1966).

[58] All facts are derived from the testimony of Special Agent Steven Lomicka given at the June 20, 2013, pretrial motions hearing.

Haugen had arrived at the Store with a 2012 Ford F-150 pick-up truck.[59]  SA Lomicka and

Duluth Police Department Sergeant Andrew Mickus (Sgt. Mickus) approached Defendant

Haugen while in the main area of the Store, identified themselves, and informed her that a search

warrant of the Store was being executed.  SA Lomicka also advised Defendant that he had two

seizure warrants, one of which was for a Ford F-150.

SA Lomicka then advised Defendant that at some point he would have to meet with her

in order to seize the Ford F-150.  SA Lomicka specifically advised Defendant that she was not

under arrest and asked her if she would be willing to talk with SA Lomicka and Sgt. Mickus.  He

did not, however, at that time, specifically tell her that she was free to leave.  SA Lomicka

testified that he would not have let Defendant leave at that point because officers still had to

seize the Ford F-150 truck; however, he did not tell her that she was not free to leave.

Subsequently, after Defendant Haugen stated that she was willing to speak to SA

Lomicka and Sgt. Mickus, the officers took Defendant to an "employee break room" in the back

of the Store, and SA Lomicka asked Defendant for her name, her association with Defendant

Carlson, her date of birth, and her residence.  SA Lomicka then again advised Defendant that she

was not under arrest, that she did not have to talk to any law enforcement officers if she did not

want to, and that if she did choose to talk with law enforcement she could stop the interview at

any time.

SA Lomicka testified that they took Defendant to the break room in the back because it

was the only practical location within the Store in which they could speak with her in a more

private setting, given that the remainder of the Store was being searched and was too "busy and

too hectic."  SA Lomicka testified that the room was "small," approximately five feet in width,

---

[59] Although SA Lomicka testified that he was unsure whether any law enforcement officer had asked Defendant to come to the Store, he stated that Defendant had not been driven to the Store by any police officers.

and contained a table, chair, and several boxes. When they entered the room, SA Lomicka turned the chair around where Defendant sat so that Defendant could look out into the Store from the room, while both of the officers sat on boxes. The door to the room remained open during the entire interview. SA Lomicka sat on a box to the side of Defendant, and Sgt. Mickus sat on a box directly in front of Defendant, such that he was partially blocking Defendant's way to door. SA Lomicka testified that Sgt. Mickus only sat in that location because of the "limited space" in the room and because it would have been impossible for all three of them to be in the room without one person essentially blocking the entrance to the room. SA Lomicka specifically informed Defendant that Sgt. Mickus was not sitting between her and the door to intimidate her, but rather, because of the limited space, in response to which Defendant acknowledged she understood. SA Lomicka also again reminded Defendant that she could terminate the interview at any time.

Defendant was neither handcuffed nor restrained during any portion of the interview, nor was she handcuffed or restrained after the interview; in fact, she voluntarily remained in the Store after the interview. At no point during the interview did either SA Lomicka or Sgt. Mickus draw their weapons or physically touch Defendant. Neither of them threatened Defendant, nor did they make any promises to Defendant. During the approximately 30-minute interview, Defendant never expressed any desire to terminate the interview and never made any request to speak with an attorney. At no point during the interview was Defendant read her Miranda rights. At the end of the interview, after Defendant had made a telephone call to Defendant Carlson, SA Lomicka requested that she take him to the Ford F-150 so that he could take possession of it pursuant to the seizure warrant he had.

### B. Analysis

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). However, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id.

The Eighth Circuit considers six (6) factors when determining whether a suspect is in custody:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the

existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). Those factors, however, are not exclusive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)). The ultimate determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005)). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

With regard to the first factor, officers never told Defendant that she was free to leave, but they also never told her that she was not free to leave. While SA Lomicka testified that he had subjectively made the decision that she would not be free to leave, there is nothing in the record to suggest that he ever communicated anything to Defendant in this regard so as to advise

her that she was not free to leave.[60]  Furthermore, he specifically advised her that she was not

under arrest and that she did not have to talk with any law enforcement officers, if she did not

want to, which is "[t]he most obvious and effective means of demonstrating that a suspect has

not been 'taken into custody or otherwise deprived of . . . freedom of action.'"  Griffin, 922 F.2d

at 1348; see also Sanchez, 676 F.3d at 631 ("The first Griffin factor weighs heavily in favor of

noncustody when officers clearly inform a suspect that she is free to leave or decline

questioning.").  Therefore, in the present case, this factor weighs heavily in favor of noncustody.

   As to the second factor, SA Lomicka testified that Defendant was never physically

touched by either of the officers, was never physically restrained in any way, and was never

handcuffed.  While Defendant was never advised that she was free to move about, she never tried

to do so and was denied.  In such circumstances, this factor is somewhat unclear and does not

weigh toward either side.  Sanchez, 676 F.3d at 631.  Additionally, SA Lomicka's subjective

intent that Defendant was not free to leave, which was not communicated to Defendant, does not

necessarily favor of finding of custody.  See United States v. Johnson, No. 13-cr-7 (MJD/LIB),

2013 WL 1435291, at *4 (D. Minn. Mar. 7, 2013), adopted, 2013 WL 1435287, at *1 (D. Minn.

Apr. 9, 2013).

   The third factor weighs in favor of noncustody.  Although it appears from the record

that once Defendant was at the Store officers approached Defendant and began talking with her,

it is unclear whether she voluntarily came to the Store or whether she was asked by law

enforcement to come to the Store.[61]  The Court notes, however, that even if she had been asked

by police to come to the Store, there is nothing in the record to demonstrate that she did not do so

---

[60] Defendant argued that if SA Lomicka had made up his mind about not letting her leave, he likely communicated his decision, perhaps through body language, to Defendant; however, beyond speculation, Defendant provided no support in the record for the assertion.

[61] Defendant's counsel argued that she had been called by law enforcement to the Store but cited to no evidence in the record in support of that assertion.

voluntarily—indeed, SA Lomicka testified that she was not driven by police to the Store. Furthermore, the Eighth Circuit has held that in considering this factor, the Court must take into account the disjunctive aspect of the inquiry. See Axsom, 289 F.3d at 501 ("[T]he court failed to analyze the disjunctive prong of the third mitigating factor—whether the defendant voluntarily acquiesced to requests by federal agents to answer questions."). Here, regardless of the circumstances that led Defendant to the Store, SA Lomicka testified that Defendant voluntarily agreed to speak with the officers prior to entering the room in which the interview took place.

With regard to the fourth factor, there is no evidence whatsoever that either SA Lomicka or Sgt. Mickus used any strong arm tactics or deceptive stratagems. Thus, this factor mitigates toward a finding that Defendant was not in custody.

The fifth factor also mitigates toward a finding of noncustody. In considering this factor, courts examine such considerations as the place and length of the interview. Griffin, 922 F.2d at 1352. While Sgt. Mickus was sitting on a box between Defendant and the exit to the break room, SA Lomicka specifically testified that they had informed Defendant that Sgt. Mickus was sitting in that location only because, practically, given the small size of the room, there was nowhere else for him to sit. They also advised her that by sitting between her and the door, Sgt. Mickus was not trying to intimidate her in any way. Furthermore, the mere fact that police block the Defendant's only exit does not demonstrate that the individual is in custody. See United States v. Huether, 673 F.3d 789, 793-795 (8th Cir. 2012) (finding the defendant not in custody even though one of the officers was "blocking the bedroom door, the room's only exit"). Moreover, the Store was a place of familiarity for Defendant. See United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004) (noting that questioning on "on [your] own turf" suggests that the environment was not inherently coercive). Additionally, there is no evidence that either of the

officers attempted to exert their authority over Defendant or commanded her to respond to their questions in any way. Given the short duration of the interview, the fact that the door to the room remained open at all times, that the officers took the time to explain the reason why they were sitting directly in front of her, combined with the fact that the room was in the Store that she was accustomed to, this factor favors a finding of noncustody.

Finally, because Defendant was not arrested or restrained in way after the interview—to the contrary, Defendant voluntarily remained in the store with the police—the Court finds that the sixth factor weighs heavily in favor of finding that Defendant was not in custody during the interview. LeBrun, 363 F.3d at 722 (explaining that the lack of arrest is a "very important factor weighing against custody").

Therefore, in considering the totality of the circumstances, the Court finds that Defendant was not in custody during the July 25, 2013, interview, and accordingly, the statements she made to police need not be suppressed.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendants' motions to suppress evidence [Docket Nos. 95, 106, 120] be **DENIED** as set forth above;

2. Defendant Haugen's motion to suppress statements [Docket No. 94] be **DENIED** as set forth above;

3. With respect to Defendants' various motions to dismiss the Superseding Indictment:

a. That Defendants' Motions to Dismiss Counts 1-17 [Docket Nos. 103, 122, 124, 183] be **DENIED**, as set forth above.

b. That Defendants' Motions to Dismiss for Violations of the Congressional Review Act [Docket Nos. 96, 105, 124, 125] be **DENIED**, as set forth above;

c. That Defendants' Motions to Dismiss for Violations of 21 U.S.C. § 811(h) [Docket Nos. 127, 156, 175] be **DENIED**, as set forth above;

d. That Defendants' Motions to Dismiss Count 21 for Improper Delegation of Authority [Docket Nos. 131, 158, 177] be **DENIED**, as set forth above;

e. That Defendants' Motions to Dismiss Count 21 for Violation of Executive Order 12988 [Docket Nos. 135, 162, 179] be **DENIED**, as set forth above;

f. That Defendants' Motions to Dismiss because the Synthetic Drug Abuse Prevention Act of 2012 was not in Effect at the Times Alleged in the Superseding Indictment [Docket Nos. 96, 105, 124, 176, 184] be **DENIED**, as set forth above;

g. That Defendants' Motions to Dismiss because the Controlled Substance Analogue statute is void for Vagueness [Docket Nos. 96, 133, 160, 178] be **DENIED**, as set forth above;

h. That Defendants' Motions to Dismiss because of the Doctrine of Entrapment by Estoppel [Docket Nos. 96, 129, 164, 180] be **DENIED**, as set forth above;

i. That Defendants' Motions to Dismiss because of Vicarious Liability [Docket Nos. 166, 181] be **DENIED**, as set forth above;

j. That Defendants' Motions to Dismiss as a "Thought Crime" [Docket No. 96, 124] be **DENIED**, as set forth above;

k.  That Defendants' Motions to Dismiss for Insufficiency of the Indictment [Docket

Nos. 152, 169, 174] be **DENIED**, as set forth above;

l.  That Defendant Carlson's Motion to Dismiss Counts 31-55 [Docket No. 96] be

**DENIED**, as set forth above.


Dated: July 25, 2013                                    s/Leo I. Brisbois
                                                        LEO I. BRISBOIS
                                                        United States Magistrate Judge


# N O T I C E

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by August 8, 2013**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.